739 A.2d 986 (1999)
325 N.J. Super. 467
Kenneth EAGEL, Individually and as Administrator of the Estate of JoElizabeth Eagel, and as parent and natural guardian of their three children, Joshua, Tara and Tiffany, Plaintiff-Appellant,
v.
Mark C. NEWMAN, M.D., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 26, 1999.
Decided November 12, 1999.
*987 Michael D. Schottland, Freehold, for plaintiff-appellant (Schottland, Manning, Rosen, Caliendo & Munson, attorneys; Bettina E. Munson, on the brief).
Martin J. McGreevy, Asbury Park, for defendant-respondent (Carton, Witt, Arvanitis & Bariscillo, attorneys; Mr. McGreevy, of counsel; Russell J. Malta, on the brief).
Before Judges PRESSLER, CIANCIA and ARNOLD.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This medical malpractice case arose out of the sudden death of decedent JoElizabeth *988 Eagel, who suffered from mitral valve prolapse. The action was filed against defendant, Mark C. Newman, M.D., by her husband, plaintiff Kenneth Eagel, individually, as administrator of the estate of JoElizabeth Eagel, and as parent and natural guardian of their three minor children, Joshua, Tara and Tiffany Eagel. He appeals from a judgment entered upon a jury verdict of no cause dismissing his complaint. He contends on appeal that the trial judge erred in refusing to instruct the jury on the issue of informed consent and in dismissing the emotional distress claims of the children. We affirm.
Decedent was thirty-nine years old at the time of her tragic and sudden death in October 1993. She had been diagnosed with mitral valve prolapse in 1983 when she was pregnant with her first child. There is no medical dispute that this is not an uncommon condition and is usually benign and asymptomatic. Some victims of the condition, however, are subject to arrhythmia, that is, an irregular heartbeat. The danger posed by an arrhythmia is its capacity to disrupt the electrical impulses of the heart resulting in what is described as an electrical storm that can lead to elevated heart rate levels, precipitous drop in blood pressure and resultant death. Mitral valve prolapse patients with associated arrhythmia are, therefore, required to be monitored and medicated, usually by a beta blocker that slows rapid and irregular heartbeat. Decedent was under care for ventricular tachycardia, a type of arrhythmia, during her pregnancy, delivered the child in a cardiac care unit as a precaution, and was prescribed Inderal, a common beta blocker, which she took until the end of 1984.
In 1986 and 1987 decedent consulted with a cardiologist, Dr. Checton, a defense witness at trial. According to his testimony, decedent was entirely stable, reported that she felt fine, exercised without palpitations and appeared to be asymptomatic and in general good health. Her two younger children were delivered without the precautions that attended the birth of her eldest, and a beta blocker was not again prescribed. Decedent did not follow up with Dr. Checton after her 1987 visit.
Decedent first consulted with defendant, an internist, in April 1992, having initially met him at the beach club where both families were members. She was not, however, seeking treatment for her cardiac condition but rather for a sore throat. Defendant was, however, aware of her cardiac history. She saw him again on several occasions for non-cardiac-related problems through January 1993. In March 1993, decedent nearly fainted at a social function and called Dr. Checton to ask for a beta blocker prescription. Since he had not seen her for six years, he declined to prescribe over the telephone and asked to see her in his office for an evaluation. Apparently she could not obtain an immediate appointment and went instead to defendant's office. According to him, she reported suffering from occasional palpitations but showed no signs of shortness of breath or chest pain. Defendant also testified that, as is his practice with all mitral valve prolapse patients, he asked decedent if she had experienced any lightheadedness or dizziness, and decedent claimed that she had not. He then prescribed Lopressor, also a beta blocker, to be taken as needed. He further testified that he had prescribed only a seven to ten-day supply of Lopressor as an impetus to her seeing her cardiologist. We note that plaintiff's expert opined that Lopressor should only be taken regularly since discontinuation may tend to make the heart more vulnerable to the effects of high blood pressure or palpitations. Defendant's expert, however, was of the view that these consequences are only relevant to conditions from which decedent did not suffer, namely hypertension and angina. In any event, it is not claimed that decedent's death was caused by Lopressor. Defendant also testified that during the course of that March visit, he had not only advised decedent to return to her cardiologist *989 for a cardiac re-evaluation and believed from her response that she intended to do so.
According to defendant, he met decedent at the beach club several times during the summer of 1993, asked her if she had yet seen her cardiologist, and when she reported that she had not but felt fine, he encouraged her to do so anyway. He did not warn her that she was under a life-threatening risk because he believed that she was not. It appears that she had stopped taking the Lopressor in June but had told her sister-in-law that she resumed the medication in August because of palpitations. On August 24, 1993, decedent visited defendant's office, again without an appointment, apparently to have blood work done for another physician. According to defendant's office note, which he read to the jury, decedent reported that she was doing well, had no weight loss, no pain, no shortness of breath and no palpitations. He was, however, on his way to do hospital rounds and, having no time to do an electrocardiogram, made an appointment for her for that purpose and for a full physical examination for the following week. She canceled the appointment and never returned to defendant's office despite his having "advised her strongly" to come for the exam. Defendant did not see her again professionally prior to her sudden death on October 27, 1994, attributed to an "electrical storm" or "short circuit" brought on by an episode of arrhythmia.
It is important to note that defendant, according to his testimony, was well aware of the risks of arrhythmia. He was quite definite in his testimony that she had never told him, either in his office or when he saw her socially, that she had experienced dizziness, lightheadedness, shortness of breath, nausea or pain and that if she had, he "would have put her in my car, and brought her right over to the hospital...." It is also important to note that plaintiff conceded that mitral valve prolapse is considered a benign condition even if attended by palpitations. Lightheadedness and dizziness are the alarming symptoms of serious trouble, that is, a potentially dangerous arrhythmia.
The theory of plaintiff's case against defendant was essentially that he deviated from the required standard of care by not appropriately responding to decedent's arrhythmia or potential arrhythmia. Plaintiff's expert opined that such symptoms of arrhythmia as lightheadedness and dizziness imposed upon him the duty to warn her of the extreme urgency of her condition and to see to it that she immediately had a proper cardiac evaluation including the twenty-four hour use of a halter monitor, an echocardiogram, a stress test, and the taking of a complete medical history. Defendant's factual response was that decedent had never, upon his questioning, reported such symptoms and that he had no reason to know and did not know that she had experienced them. Dr. Checton, decedent's cardiologist, moreover, testified that defendant had acted properly in the case of a mitral valve prolapse patient with no indication of arrhythmia symptoms and that he would not have treated her differently in the period from March 1993 on.
It is clear that there was a factual dispute respecting defendant's alleged deviation from the standard of care, a dispute that centered on the question of whether defendant knew or should have known that decedent had symptoms of arrhythmia, since if he did or should have known, he concedes he would have been obliged to follow-up with appropriate tests or to hospitalize her and to make sure that she appreciated the urgent necessity of immediate cardiological attention. We think it plain that the jury's finding that defendant had not deviated from the required standard of care could not have been reached without it also having found that defendant did not have this knowledge. It thus clearly accepted his testimony in that regard, rejecting plaintiff's witnesses who testified to the contrary. It was free to do so.
*990 Plaintiff does not challenge the jury's finding that there was no deviation from the applicable standard of care. His argument rather is that the proofs also supported defendant's liability on an informed consent theory, which the judge refused to charge, but which he permitted counsel to argue in her summation. As we understand plaintiff's argument, the gravamen of that theory was that even if defendant reasonably believed that decedent's mitral valve prolapse condition was benign in view of her own alleged assertions and the ten years which had elapsed since her arrhythmia episode, nevertheless he should have warned her about the seriousness of lightheadedness and dizziness should those symptoms appear and her need in that event to seek immediate medical attention. Defendant's position, accepted by the trial judge, was that such a failure to warn was subsumed by the deviation theory. In sum, the judge charged the jury that defendant would be liable if he was negligent in his diagnosis or treatment of decedent. Plaintiff argued that liability was premised not only on negligent treatment or diagnosis but also upon defendant's negligence in the giving or withholding of advice, a deficiency he equated with the failure to obtain informed consent. The judge declined to add "advice" to "diagnosis and treatment" having concluded that "advice" is an included concept within the category of "treatment."
We are satisfied that informed consent was an inapposite theory. As the Supreme Court explained in Matthies v. Mastromonaco, 160 N.J. 26, 35, 733 A.2d 456 (1999), quoting Perna v. Pirozzi, 92 N.J. 446, 459, 457 A.2d 431 (1983), "[i]nformed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to `evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment" (quoting from Canterbury v. Spence, 464 F.2d 772, 780 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed. 2d 518 (1972)). Thus the informed-consent basis of malpractice, as opposed to deviation from the applicable standard of care, rests not upon the physician having erred in diagnosis or administration of treatment but rather in the failure to have provided the patient with adequate information regarding the risks of a given treatment or with adequate information regarding the availability of alternative treatments and the comparative risks and benefits of each. See, e.g., Baird v. American Medical Optics, 155 N.J. 54, 71, 713 A.2d 1019 (1998); Teilhaber v. Greene, 320 N.J.Super. 453, 465, 727 A.2d 518 (App.Div.1999).
Patently, neither explanation of the risks of a proposed treatment nor explanation of the comparative risks and benefits of available options is what this case is all about. The crux of plaintiff's claim against defendant is that he did not appreciate the seriousness of decedent's condition, that he did not respond appropriately to it, and that these failures permitted her to regard her condition too cavalierly. But that is what the deviation case was all about, namely, that confronted with a patient with mitral valve prolapse and a history of arrhythmia some ten years earlier, defendant was negligent in not taking an adequate history, not adequately interrogating her as to her symptoms, not responding to critical symptoms (if she had them) by treatment or warning, and not assuring that she had a proper cardiological evaluation. We regard these failures, if there were such failures, and the jury determined to the contrary, as negligence in diagnosis and treatment, i.e., deviation.
A simple analogy explains our point. It is well known that a possible complication of mononucleosis is a ruptured spleen. If a physician treats the disease by prescribing medication and bed rest but does not warn the patient of that complication or tell the patient what its symptoms are or what to do if they appear, it may well be that the doctor will be deemed negligent in the overall treatment since proper treatment *991 would, in our view, comprehend the giving of that advice to the patient. The physician would, however, not thereby have failed to obtain the patient's informed consent to the treatment that was administered.
We are persuaded that plaintiff's informed consent argument here confuses the course of the disease with the course of the treatment. These are very different matters. Not taking the necessary and available steps to protect the patient or to permit the patient to protect himself from the potential course of the disease is negligent treatment. Depriving the patient of the opportunity to reasonably determine for herself whether she wishes to accept the risks of a proposed or alternate treatment is an informed consent failure irrespective of whether the treatment itself is performed in accordance with prevailing medical standards. If not so performed, then, of course, the patient will also have a cause of action based on deviation. In sum, we are satisfied that a physician's failure to advise a patient respecting the disease is potentially a treatment deviation, not potentially a failure to obtain informed consent. We are also convinced that in rejecting the claimed deviation, the jury also addressed and rejected the factual elements on which plaintiff based his informed consent theory. They were, indeed, the same.
Plaintiff also argues that the trial judge erred in dismissing the claim of the decedent's children for emotional distress. We do not address the issue of whether their witnessing of their mother's sudden death brings the claim within the parameters of Portee v. Jaffee, 84 N.J. 88, 417 A.2d 521 (1980). It is clear that prerequisite to a Portee claim is the fact that the event witnessed by the bystanders must have resulted from defendant's negligence. The jury, however, found that defendant was not negligent, and we have rejected the argument that in addition to deviation negligence, the jury should have been asked to consider informed consent negligence. Consequently the children's emotional distress claim must fail in the absence of the negligence predicate.
The judgment appealed from is affirmed.