754 A.2d 1215 (1999)
333 N.J. Super. 165
Joseph K. FARINA, Executor of the Estate of Marie Farina, Deceased, and Joseph Farina, Individually, Plaintiff-Respondent,
v.
Elliott M. KRAUS, M.D., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 1, 1999.
Decided December 22, 1999.
*1216 Melvin Greenberg, Newark, argued the cause for appellant (Greenberg Dauber Epstein & Tucker, attorneys; Mr. Greenberg and Michael H. Freeman, on the brief).
Bard L. Shober argued the cause for respondent (Weiss & Shober, attorneys; Mr. Shober, on the brief).
Before Judges KING, KLEINER and PAUL G.LEVY.
The opinion of the court was delivered by KING, P.J.A.D.

I
This is a medical malpractice case premised on negligent diagnosis and treatment of bladder cancer. Plaintiff's wife Marie Farina (Farina) eventually died as a result of a claimed failure to diagnose and treat a "transitional cell carcinoma" of the bladder. Plaintiff recovered a net verdict of $136,000 in this wrongful death and survival action. We conclude that trial error requires a new trial on liability and damages. We reverse and remand.

II
Farina was age seventy-one at the time of her death on July 27, 1995. On February 28, 1990 Farina was admitted to the Shore Memorial Hospital emergency room complaining of an inability to urinate and vaginal bleeding. Staff doctors examined Farina and determined that she was in urinary retention, meaning that she was unable to empty her bladder, and that her bladder was full. The doctors proceeded to catheterize her and found bloody urine: "Gross hematuria is evident [-] blood in the urine." Staff doctors recommended that she see defendant Elliott M. Kraus, M.D., a urologist.
Dr. Kraus first examined Farina on March 1, 1990. He performed a number of tests, including a CBC with a differential (an analysis of red and white blood cell count), a urine culture (detects the presence of infection in the urine), a chest x-ray, an IVP (an x-ray of the patient's kidneys, ureters and bladder after an injection with dye), and a cytoscopy and biopsy of her bladder. Cytoscopy is an endoscopic procedure which uses an instrument like a telescope to look inside the bladder. The cytoscope has three lenses which allow physicians to view the inside of the bladder at various angles. Dr. Kraus testified that the cytoscope enables a doctors to visualize "every square centimeter of the inside of the bladder."
The IVP showed the kidneys and ureters to be normal. The urinanalysis showed she had red blood cells and bacteria in her urine. The cytoscopy, performed on March 2, 1990, showed some signs of infection. Dr. Kraus also performed a biopsy of Farina's bladder. He testified that his diagnosis before he performed the cytoscopy was hemorrhagic cystitis, where the bladder is so inflamed that it begins to bleed, and urinary retention. The cytoscopy revealed hemorrhagic mucosal changes most prominent on the back wall of the bladder.
*1217 At this time, Dr. Kraus "biopsied the most suspicious appearing area of the hemorrhagic mucosal changes on the posterior portion of the bladder on the left side." He described the most suspicious area as the "area that looked worse and could be turning to cancer or bein fact, cancer." Dr. Kraus found no evidence of malignant tumor at this time. In sum, there, was no sign of cancer as a result of the cytoscopy or the biopsy. Dr. Kraus concluded that Farina had a neurogenic bladder a condition that affects the bladders of older women making them unable to completely empty their bladders in a normal fashion. This condition typically occurs when the sphincter fails to open completely on attempt to urinate, causing the bladder to squeeze harder to expel the urine. Farina was discharged on March 3, 1990 and placed on an antibiotic called Cipro.
Dr. Kraus saw Farina twelve times in that first year after discharge from the hospital. On March 14 and March 28, 1990 Farina was seen by Dr. Kraus at his office. During these two visits, Dr. Kraus performed a urinanalysis. During the March 14, 1990 visit, she was voiding better. The urinanalysis was essentially normal and showed only one or two red blood cells in her urine. This did not surprise Dr. Kraus because her bladder was severely inflamed and raw. During the March 28, 1990 visit, Farina complained of "difficulty urinating, straining, poor flow." The urinanalysis again only showed one or two red cells. Dr. Kraus catheterized Farina because she was carrying 350 cc's of urine. Dr. Kraus diagnosed "probable dyssynergia" (muscle weakness). Dr. Kraus prescribed Hytrin, which relaxes the sphincter muscle. The initial dose was one milligram once a day. Farina did not experience gross hematuria, as before her hospitalization.
Dr. Kraus next saw Farina on April 9, 1990. She reported that she had one episode of retention. Dr. Kraus increased the dose of Hytrin to one milligram twice a day. At her April 11, 1990 visit, the urinanalysis showed some white cells, meaning that she still had an inflammatory
process, but Farina stated that she was voiding better without straining. She continued on the Hytrin. On her next visit, April 23, 1990, Farina stated that she was voiding fairly well but was arising two or three times a night to urinate. She was catheterized at that point and her residual urine was much less about 130 cc's. Dr. Kraus continued Farina on Hytrin. At the April 30, 1990 visit, Farina's post-residual void after catheterization was 260 cc's, an increase of about eight ounces. Dr. Kraus increased the Hytrin to three milligrams per day.
At her May 11, 1990 visit, Farina was unable to void. She eventually voided 40 cc's of urine and then was catheterized for 280 cc's of post-void residual urine. Dr. Kraus increased her Hytrin to four milligrams per day. On her June 20 and August 22, 1990 visits, Farina was voiding well and continued on Hytrin through October 1990. Dr. Kraus testified that in 1990 Farina's voiding ability improved.
In 1991, Dr. Kraus saw plaintiff on three occasions, January 23, April 24 and December 1. The urinanalysis tests performed on these dates showed no signs of blood in her urine. On January 23, 1991 Dr. Kraus ordered a bladder ultrasound test because plaintiff had a neurogenic bladder. This bladder ultrasound study was not performed until May 23, 1991. During the first two visits, Farina was voiding well. At the December 1, 1991 visit, however, she showed signs of acute urine retention. Dr. Kraus prescribed Hytrin for her again.
Farina saw Dr. Kraus about five times in 1992, first on January 2, 1992. A cytometrogram was performed during this visit. The cytometrogram showed that her bladder was irregular and also showed the same type of diverticula that Dr. Kraus had seen when he had examined her in 1990. (Dr. Malloy, defendant's expert, explained that the cause of the diverticula was the fact that the bladder was "working hard and pushing against a fixed resistance.") Dr. Kraus next saw Farina on *1218 January 23,1992. At this time, she had no voiding discomfort, was urinating satisfactorily, and was taking the Hytrin. (Dr. Malloy, defendant's expert, testified that because Farina had a neurogenic bladder and no gross hematuria, there was no reason to consider urine cytology as a test in 1992.) By May of 1992 her urinanalysis was negative. On August 13, 1992 again her urinanalysis was negative. This meant that she had no white blood cells and no red blood cells in her urine at the time. Through 1992 Farina did not have any burning, or complaints of blood in her urine; her urinanalysis was clear. In November of 1992 her urinanalysis again was negative and she continued on the Hytrin. In sum, from late 1991 through 1992, Farina never had complaints or signs of gross hematuria.
Farina's next visit with Dr. Kraus took place in May of 1993. Her urinanalysis at this time was negative. The urinanalysis conducted by Dr. Kraus in August of 1993 showed some white cells, but no gross hematuria. By November of 1993 Farina again had developed gross hematuria. On November 8, 1993 Farina went to the hospital complaining of some difficulty with urination. A urinanalysis confirmed that she had blood in her urine. Farina told Dr. Kraus that she had suprapubic pain for a day or two, dysuria, and noticed blood in her urine. Dr. Kraus ordered an ultrasound kidney study. Farina did not have these tests performed. She never returned to Dr. Kraus and never spoke to him after November 8,1993.
On November 9, 1993 Farina was seen by Dr. Arthur Nahas for an unrelated medical condition. When Dr. Nahas saw that her catheter was bloody, he advised that she seek a second opinion. On November 10, 1993 Farina saw Dr. Howard Slotoroff who advised her she had a tumor and to go to the Medical Center immediately for testing. The testing confirmed Dr. Slotoroff's preliminary clinical finding of a massive tumor on the right wall of her bladder.
On December 7, 1993, about a month after the cancer was discovered by Dr. Slotoroff, Farina underwent surgery. Her bladder and uterus were removed. Her diagnosis was metastatic cancer. She underwent chemotherapy and radiation therapy in a futile attempt to control the spread of the disease. On July 27, 1995 she died of the advanced spread of cancer.

III
At trial, Jack H. Mydlo, M.D., a boardcertified urologist, testified as plaintiff's expert. He stated that the cytoscopy, the IVP, and the cytology tests are important to rule out malignancy in the bladder. He also testified that there are limits to the ability of the cytoscopy to rule out a malignant process. He said that "even if you do a cytoscopy and you get a pretty good picture a pretty general picture is not 100 percent, is not without missing something, because there are blind spots." He said that tumors are missed, even in the best of hands.
Dr. Mydlo testified that Dr. Kraus deviated from the standard of care by failing to perform a urine cytology test. Dr. Mydlo explained that a urine cytology test is a "very simple non-invasive" test. He said that "[y]ou can just have the patient go urinate in a cup and send that off to a laboratory, so it's non-invasive." He added that "while you're doing the cytoscopy, you can certainly do a cytology, because the urine can just flow from the cytoscope, and you can send that urine off for a cytology." He said that "[a]fter the cytoscope [test] or during the cytoscope I would've in addition added a cytology especially because they had numerous trabeculation diverticula." He testified that "[t]he average urologist or even the above average urologist would have gotten urine cytology several times just to make sure that they did not miss anything. It's certainly simpler than scoping again and again, and it's a harmless non-invasive test."
Dr. Mydlo opined that had Dr. Kraus performed these cytology tests during *1219 1990, the tests would have probably shown "something other than normal." When asked his opinion as to "whether or not had Dr. Kraus followed the standard of care with respect to cytology testing, the bladder cancer that was discovered in November of 1993 could have been prevented at an earlier stage and produced a different result," Dr. Mydlo responded "[i]t probably would've been."
Dr. Mydlo testified that there was a school of thought in urology holding that specialists should employ cytology testing in the absence of hematuria when following patients at risk for bladder cancer. On the other hand, Dr. Mydlo testified that there are limits to the effectiveness of cytology. He stated that
you may not get a good sample ... because the patient sometimes [ ] ... has just [gone] to the bathroom, and therefore, they give you a sample that's very small, doesn't have a very good representation of the bladder. It could be limited by the person reading the slides. They may not be expert enough. It may not be fixed properly, because once you make the urine in the cup or container ... you should fix it immediately with formalin or alcohol so the cells maintain their shape. If you don't, and it sits on the table for a few hours, the cells will undergo changes. They may not be representative, and it would be very hard for the person reading it to say what's going on, so those are several kinds that can give you false information.
On cross-examination, when asked whether the cytology testing could have detected the tumor in 1991 or 1992 with a reasonable medical probability, Dr. Mydlo stated that "[t]he cytologies early on if cytology is atypia, atypia does not necessarily mean there's a tumor there, but it would make one weary [wary?] to follow the patient more than ... just several years gone by, and that would've led to more serial cytologies which could have picked up a tumor later." He added that the testing would have detected the tumor with reasonable certainty because if the doctor performs annual cytologies the chance of getting a positive result increases.
Dr. Mydlo agreed that the use of cytoscopy and bladder biopsy are elements of the standard of care in treating a patient with neurogenic bladder and hematuria. Dr. Mydlo also recognized that one of the standards of care in treating a patient like Farina was a urinanalysis. Dr. Mydlo admitted that Dr. Kraus performed a urinanalysis on plaintiff after March of 1990 and through November of 1993. He acknowledged that on each of these occasions the results were negative for red blood cells. He testified, however, that with a patient with gross hematuria and then a neurogenic bladder who does not exhibit recurrent hyperhematuria, the standard of care requires a yearly cytology. Dr. Mydlo thought that the reasonable standard of care required Dr. Kraus to perform a cytology test in 1990 and thereafter.
In his defense, Dr. Kraus explained his reasons for not performing a urine cytology test. "Urine cytology is a test where you take a sample of urine and it's analyzed by the laboratory, looking specifically for cancer cells that are floating around in the urine or any cells that looked abnormal. The main reason is to pick up cancer cells." He stated
[t]he urine cytology, even in the best of situations, is not always accurate. In 30 to 40 percent of the time, it can be inaccurate, even in the best of things. Here is a woman with a catheter in, urine draining out, bleeding. The chances of urine cytology being remotely helpful or accurate in this state was zero, number one. Number two, the standard of care in someone who is bleeding requires that you do cytoscopy and it requires that you do a biopsy. That, plus IVP, are the tests that you must do, regardless....
Dr. Kraus further stated that
[cytology] would be useless for the following reasons ... you need to have a sample of urine staying in the bladder *1220 long enough for cancer cell[s], if present, to be washed into it. She had a catheter in all the time. Her bladder was empty. There would have been no possible way to collect any meaningful urine from her to get a sample, number one. Number two, she was bleeding. She had terrible inflammation inside her bladder. The catheter was in, which only increases it. Her urine, if you could get some urine from it and look at it under a microscope, would just have millions of inflammation cells in it and inflammation cells look atypical. They don't look normal. So if you took aif you could somehow get any of that, you would get nothing ... There would be no way to find cancer cells. Every cell would look funny and it didn't make a difference because she had to be biopsied. She had to be biopsied. That's the standard. That's the only way you're going to get cancer cells....
Dr. Kraus said that cytology testing is performed on patients who have proven bladder cancer. He testified that generally he "would discuss cytology testing in terms of something that we might do in the future if you have bladder cancer." He stated that "I would talk about it as a test that she should be aware of but I would not offer it to her at that time as a test in the hospital."
Defendant presented the expert testimony of Dr. Terrance R. Malloy, chief urologist at Pennsylvania Hospital in Philadelphia. Dr. Malloy disagreed with plaintiff's expert's suggestion that the standard of care required a urine cytology during plaintiff's hospitalization in 1990 and thereafter. He stated that "a urine cytology was a waste of time." He explained that the "problem with cytology is, if someone has an acute infection, like Mrs. Farina ..." the inflammation in the bladder will distort any cytology test results. Dr. Malloy also testified that "in the face of this lady who's responding well to medical therapy, and continuing to have some inflammatory process" the standard of care does not require urine cytology in that first six months or eight months after her hospitalization in the absence of recurrent hematuria. Dr. Malloy said that the urine cytology test is a tool that helps doctors if "somebody already has a cancer of the bladder, and you want to follow them in between cytoscopies for checkups." He also testified that Dr. Kraus' care and treatment of Farina in 1990 and thereafter through November 1993 complied with the requisite professional standard of care. Dr. Malloy stressed that the standard of care for a patient such as Farina did not require a urine cytology
because she had a complete work-up, which had a cytoscopy and a biopsy, which is much more thorough. The urologist is looking at the whole wall of the bladder, and he's doing biopsies. And having a piece of tissue to look underneath the microscope is much better than just some random cells that have been spun out from a urine sample. So as I said, the urine cytology is not the standard of care for working up hematuria in a lady that came in in urinary retention.
Dr. Malloy said that during the period from early 1991 through December 1991, the standard of care did not require urine cytology because she "was not having hematuria, so there was no indication that cytology was needed." He also testified that the standard of care did not require that Dr. Kraus perform urine cytology at any time in 1993.

IV
The jury verdict form posed the following interrogatories to the jury pursuant to R. 4:39-2:
1) Did defendant Dr. Kraus fail to advise the plaintiff of available treatments, procedures or tests that a reasonably prudent patient in the plaintiff's position would expect a doctor to disclose in order that the patient might make an informed decision on available treatments, procedures or tests?
If your answer is "YES", proceed to the next question.
*1221 If your answer is "NO", proceed to question No. 5.
The jury answered "YES" and voted six to one.
2) Do you find that a reasonably prudent patient under the circumstances of this case would have consented to and submitted to the treatment, procedures or tests had she been so informed.
If your answer is "YES", proceed to the next question.
If your answer is "NO", proceed to question No. 5.
The jury answered "YES" and voted seven to zero.
3) Did defendant Dr. Kraus' failure to advise the plaintiff of alternative treatments, procedures or tests increase the risk of harm posed by plaintiff's preexisting condition?
If your answer is "YES", proceed to the next question.
If your answer is "NO", proceed to question No. 5.
The jury answered "YES" and voted six to one.
4) Was the increased risk a substantial factor in producing the ultimate injury? Proceed to next question.
The jury answered "YES" and voted seven to zero.
5) Did defendant Dr. Kraus deviate from accepted standards of medical practice?
If your answer is "YES", proceed to the next question.
If your answer is "NO", and your answer to question Nos. 1,2,3, or 4 was "NO", you may cease your deliberations and return your verdict.
If your answer is "NO", and your answers to question Nos. 1 through 4 was "YES", proceed to question No. 7.
The jury answered "NO" and voted seven to zero.
6. Did defendant Dr. Kraus' deviation from accepted standards of medical practice increase the risk of harm posed by plaintiff's pre-existing condition?
If your answer is "YES", proceed to the next question.
If your answer is "NO", and your answer to question Nos. 1, 2, 3, or 4 is "NO", you may cease your deliberations and return your verdict.
If your answer is "NO", and your answer to question Nos. 1 through 4 is "YES", proceed to question No. 7.
[Not answered pursuant to instruction to No. 5.]
7. Was the increased injury a substantial factor in producing the ultimate injury?
If your answer is "YES", proceed to the next question.
If your answer is "NO", and your answer to question Nos. 1, 2, 3, or 4 was "NO", you may cease your deliberations and return your verdict.
If your answer is "NO," and your answer to questions Nos. 1 through 4 is "YES", proceed to question No. 8.
The jury answered "YES" and voted seven to zero.
8. Has defendant Dr. Kraus proved that some portion of the plaintiff's ultimate injury would have occurred even if defendant Dr. Kraus' treatment and/or advice was proper?
If your answer is "YES", proceed to the next question.
If your answer is "NO", proceed to question No. 11.
The jury answered "YES" and voted seven to zero.
9. Has defendant Dr. Kraus proven that plaintiff's injuries can be reasonably apportioned between these injuries that are solely attributable to plaintiff's preexisting condition, and those injuries that are solely the result of the defendant's negligence?
If your answer is "YES", proceed to the next question.
If your answer is "NO", proceed to question No. 11.
*1222 The jury answered "YES" and voted seven to zero.
10. State in percentages, what portion of the ultimate injury resulted from a) the pre-existing condition and b) Dr. Kraus' negligence and/or failure to advise of available test.
With regard to a), the jury answered sixtypercent. With regard to b), the jury answered forty-percent. The jury vote was seven to zero.
11. What amount of money, set forth in a lump sum, would fairly and reasonably compensate the plaintiff for her injuries for pain, suffering, disability, impairment, and loss of enjoyment of life?
The jury answered $160,000 and voted six to one.
Mr. Farina's losses of his wife's services up to the date of her death.
The jury answered $40,000 and voted seven to zero.
Pecuniary losses resulting from her death.
The jury answered $140,000 and voted six to one.
Thus, the jury found that Dr. Kraus was not negligent in his treatment of plaintiff, inferentially concluding that he did not deviate from the standard of care by rejecting use of urine cytology tests on Farina. The jury found, however, that Dr. Kraus breached the duty of informed consent by failing to disclose the existence and availability of the urine cytology test to Farina.
Within ten days of the jury's verdict Dr. Kraus moved for a judgment notwithstanding the verdict or in the alternative a new trial. On August 20, 1998 the judge denied Dr. Kraus' motion.

V
Defendant Dr. Kraus claims the doctrine of informed consent did not apply to this case. He claims that in this context, where the failure to use a diagnostic laboratory test of arguable value is in issue, only the standard of care is implicated. The defendant also contends that he is entitled to a reversal and a judgment notwithstanding the verdict because the jury clearly found in answer to interrogatory # 5 that he "did not deviate from accepted standards of medical practice."
We agree with defendant that the doctrine of informed consent had no place in the case. The nub of plaintiff's presentation was that Dr. Kraus should have performed a cytology test in 1990 and serial cytology tests thereafter. Plaintiff asserts that if defendant had adhered to this standard of care, the outcome for Farina would likely have been different. The defense contended that the cytology test was not required by reasonable medical practice and defendant Dr. Kraus bore no responsibility for the fatal outcome.
Judge Pressler's precise comments in our recent decision, Eagel v. Newman, 325 N.J.Super. 467, 739 A.2d 986 (App.Div.1999), are very appropriate in this situation where the only liability issue in the case is whether or not the defendant doctor deviated from the requisite standard of care in his diagnosis and treatment of the patient. Judge Pressler said:
We are satisfied that informed consent was an inapposite theory. As the Supreme Court explained in Matthies v. Mastromonaco, 160 N.J. 26, 35 [733 A.2d 456] (1999),quoting Perna v. Pirozzi, 92 N.J. 446, 459 [457 A.2d 431] (1983), "[i]nformed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to `evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment" (quoting from Canterbury v. Spence, 464 F.2d 772, 780 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972)). Thus the informed-consent basis of malpractice, as opposed to deviation from the applicable standard of care, rests not upon the physician having erred in diagnosis or administration of treatment but rather in the failure to have provided the patient with adequate information regarding *1223 the risks of a given treatment or with adequate information regarding the availability of alternative treatments and the comparative risks and benefits of each. See, e.g., Baird v. American Medical Optics, 155 N.J. 54, 71, 713 A.2d 1019 (1998); Teilhaber v. Greene, 320 N.J.Super. 453, 465, 727 A.2d 518 (App. Div.1999).
Patently, neither explanation of the risks of a proposed treatment nor explanation of the comparative risks and benefits of available options is what this case is all about. The crux of plaintiff's claim against defendant is that he did not appreciate the seriousness of decedent's condition, that he did not respond appropriately to it, and that these failures permitted her to regard her condition too cavalierly. But that is what the deviation case was all about, namely, that confronted with a patient with mitral valve prolapse and a history of arrhythmia some ten years earlier, defendant was negligent in not taking an adequate history, not adequately interrogating her as to her symptoms, not responding to critical symptoms (if she had them) by treatment or warning, and not assuring that she had a proper cardiological evaluation. We regard these failures, if there were such failures, and the jury determined to the contrary, as negligence in diagnosis and treatment, i.e., deviation.
A simple analogy explains our point. It is well known that a possible complication of mononucleosis is a ruptured spleen. If a physician treats the disease by prescribing medication and bed rest but does not warn the patient of that complication or tell the patient what its symptoms are or what to do if they appear, it may well be that the doctor will be deemed negligent in the overall treatment since proper treatment would, in our view, comprehend the giving of that advice to the patient. The physician would, however, not thereby have failed to obtain the patient's informed consent to the treatment that was administered.
We are persuaded that plaintiff's informed consent argument here confuses the course of the disease with the course of the treatment. These are very different matters. Not taking the necessary and available steps to protect the patient or to permit the patient to protect himself from the potential course of the disease is negligent treatment. Depriving the patient of the opportunity to reasonably determine for herself whether she wishes to accept the risks of a proposed or alternate treatment is an informed consent failure irrespective of whether the treatment itself is performed in accordance with prevailing medical standards. If not so performed, then, of course, the patient will also have a cause of action based on deviation. In sum, we are satisfied that a physician's failure to advise a patient respecting the disease is potentially a treatment deviation, not potentially a failure to obtain informed consent.

[Id. at 474-75, 739 A.2d 986.]
This case before us is not about options for a course of treatment or for surgery but about suitable diagnostic testing. If the doctor wrongly failed to use the cytology test and this led to a diagnostic mistake which adversely affected the outcome, the doctor can be liable. If the standard of reasonable care did not require using the cytology test to aid a diagnosis, then there is no liability here. There is either a deviation, or there is not. A malpractice defendant does not have a duty to discuss every possible non-invasive, risk-free diagnostic or laboratory test with a patient and secure a consent to or waiver thereof. The doctor must, of course, use reasonable care and skill in choosing the diagnostic tests and interpreting the results. If he does not, he is vulnerable.

VI
Finally, we conclude that the proper disposition here, in light of the seemingly conflicting answers to interrogatories by *1224 the jury, is a remand for a new trial on all issues, i.e., negligence, causation and damages. Indeed, the jury's answers to the questions, including the percentage apportionment and damages answers, smack of a possible compromise verdict.
Here, the case was submitted to the jury on a proper theory, deviation from the standard of care, and an improper theory, informed consent. We conclude that this erroneous approach by the trial judge "irremediably tainted the jury's special verdicts." Ahn v. Kim, 281 N.J.Super. 511, 534, 658 A.2d 1286 (App.Div. 1995), aff'd, 145 N.J. 423, 434-35, 678 A.2d 1073 (1996). "That ruling [remand for a new trial] comports with the general rule that issues in negligence cases should be retried together unless the issue unaffected by the error is entirely distinct and separable from the other issues." Id. at 434, 678 A.2d 1073. See also, Lewis v. American Cyanamid Co., 155 N.J. 544, 561, 715 A.2d 967 (1998). In this case the "informed consent" and "deviation" issues were ineluctably interrelated as they were presented to and argued before the jury. In this circumstance, the verdict in favor of defendant on the proper submission, the "deviation" theory, is simply not trustworthy where the balance of the verdict, on the "informed consent" theory, at least suggests the defendant somehow failed his patient.
Reversed and remanded for a new trial on all issues.