850 A.2d 537 (2004)
370 N.J. Super. 21
Philomena LINQUITO, as Executrix of the Estate of Arthur Linquito and Philomena Linquito, Individually, Plaintiff-Appellant/Cross-Respondent,
v.
Andrew L. SIEGEL, M.D., Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 18, 2004.
Decided June 16, 2004.
*538 Bruce H. Nagel, Livingston, argued the cause for appellant/ cross-respondent (Nagel Rice & Mazie, attorneys; Mr. Nagel, on the brief).
David P. Weeks argued the cause for respondent/ cross-appellant (Ruprecht, Hart & Weeks, attorneys; Lopa N. Patel, on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and KIMMELMAN.
The opinion of the court was delivered by
STERN, P.J.A.D.
Following a trial of her case against defendant on negligence and informed consent claims, plaintiff, as executrix of her late husband's estate and individually, appeals from a molded judgment in the amount of $7,285, based on an assessment that 90% of decedent's "ultimate injuries or damages" were attributable to his pre-existing cancer. Defendant cross-appeals from the denial of his pretrial motion to dismiss the informed consent claim on which the jury found liability. The jury found no negligence or "deviat[ion] from accepted standards of medical practice."
*539 Plaintiff argues that she is entitled to a new trial on damages and on the Scafidi allocation issue, see Scafidi v. Seiler, 119 N.J. 93, 574 A.2d 398 (1990), while contending that "the liability issues should not be retried." On his cross-appeal, defendant seeks a reversal of the judgment and dismissal of the complaint because there is no basis for a verdict premised on lack of informed consent.
We reverse the judgment based on lack of informed consent, but order a new trial on all issues on the negligence claim.

I.
In her complaint, plaintiff alleged that defendant, a urologist, deviated from the standard of care in his treatment of her husband (decedent) for bladder cancer, thereby contributing to his death. Plaintiff asserted claims for survivorship, wrongful death and loss of consortium.
At trial, plaintiff pursued two theories of liability: (1) a negligent diagnosis/treatment theorythat defendant deviated from the standard of care when he failed to diagnose the recurrence of decedent's bladder cancer in April 1997; and (2) an informed consent theorythat in April 1997 defendant failed to inform decedent of all information a reasonable person would expect a doctor to disclose, thereby depriving him of his ability to make an informed decision about whether to pursue additional diagnostic testing or courses of treatment.[1]
The jury concluded that defendant was not negligent in failing to diagnose and treat the cancer. However, the jury also concluded that defendant failed to obtain decedent's informed consent regarding additional diagnostic testing which could have been performed, and that this failure "increase[d] the risk of harm posed by the [decedent's] preexisting condition." As already noted, the jury attributed ten percent of the "ultimate injuries or damages" to defendant's failure to obtain decedent's informed consent.
In assessing damages, the jury awarded $12,000 to decedent's estate for his "pain, suffering, disability, impairment and loss of enjoyment," $13,000 to his survivors for wrongful death, and $15,000 to plaintiff on her loss of consortium. Defendant also stipulated to $20,000 in unreimbursed medical and funeral expenses. On April 4, 2003, the trial judge entered final judgment, molding the jury's verdict and reducing the damage awards in accordance with the percentage of liability assessed by the jury. The court awarded plaintiff damages in the amount of $7,285 ($6,000 in damages, that is 10% of the aggregate $60,000 damage award, plus $1,285 in prejudgment interest).

II.
Decedent first visited defendant on January 26, 1996. At that time, decedent was a seventy-four-year-old retiree. He complained of "urinary hesitation" ("a urinary stream that is [slow or] hesitant to start"), frequent urination, burning and discomfort when urinating, and erectile dysfunction. Defendant performed a physical examination and found a mass in the right upper quadrant of the abdomen, as well as a *540 nodular and firm prostate, which are signs of prostate cancer. Defendant discussed his findings with decedent and ordered a variety of tests to determine the cause of the symptoms.
According to the proofs, there are several tests used to detect bladder cancer. They include cytology, which involves taking urine samples which are tested by a pathologist. If malignant cells are discovered, additional testing must be performed to discover the location of the cells within the urinary tract. Cytology is successful in detecting between eighty and ninety percent of high-grade or "aggressive" cancers.
Cystoscopy involves a visual examination of the bladder through the use of a cystoscope, an instrument containing a light and a camera lens, which is inserted through the urethra into the bladder, allowing visual examination of the interior surface of the bladder. Cystoscopy provides only "a one-dimensional view" of the bladder and, therefore, cannot detect cancer that is not visible on the surface of the bladder. However, bladder cancers are "transitional cell cancers"; they originate from the transitional cells which are unique to the lining of the urinary tract, and then spread into the bladder wall. Therefore, virtually all bladder cancers would be visible on the surface of the bladder. As a result, even plaintiff's expert urologist admitted that it would be "rare" for a bladder cancer not to be visible by cystoscope.
A third diagnostic technique involves a biopsy or removal of tissue from the bladder and having it tested for cancer by a pathologist. Finally, a CT scan can be taken to x-ray and examine the lower pelvis. However, CT scans are typically used to "stage" the progress of bladder cancer which has already been diagnosed based on other tests and to determine the extent to which the cancer has spread beyond the bladder. The CT scan is "three-dimensional" and can detect cancer "which does not appear on the inner surface of the bladder."
Among the tests defendant performed on decedent in February 1996 was a cystoscopy. The cystoscopy revealed a lesion or tumor on the right side of the bladder, which defendant believed was positive for cancer. Defendant discussed these findings with decedent and one week later performed surgery to remove the tumor as well as some surrounding tissue.
Post-surgical biopsies revealed that the tumor was cancerous. The cancer had been located on the surface of decedent's bladder, with some invasion into the submucosa and lymph channels of the bladder wall, but with no invasion into the muscular wall of the bladder. The bladder cancer was an aggressive form which recurs in approximately seventy percent of its victims.
Defendant treated decedent with six courses of BCG therapy over a six-week period. BCG is a tuberculosis vaccine used as a form of chemotherapy to prevent the recurrence of bladder cancer. It is injected into the bladder through a catheter.
Thereafter, decedent returned to defendant for follow-up testing every three months. In June 1996, defendant performed a cytology and a cystoscopy, and took tissue samples from suspicious-looking areas of the bladder for biopsy. These tests showed no evidence of cancer.
At decedent's September 1996 visit, defendant performed a cytology and a cystoscopy, neither of which revealed any evidence of cancer. Defendant also gave decedent another three courses of BCG therapy.
In December 1996, decedent reported discomfort in his right groin and testes, *541 and defendant also noted weight loss. Defendant performed a cytology, a cystoscopy, and a physical examination of decedent's groin, testes and rectum. None of these tests revealed any cancer. Defendant also gave decedent another three courses of BCG therapy, which continued into early January 1997.
In March 1997, decedent visited his general practitioner, Dr. Arnold Leibowitz, who ordered a pelvic CT scan. The scan was performed on March 29, 1997, and the radiologist's report was generated on March 31, 1997. The radiologist reported a "thickening measuring just over 2 cm," of the right lateral wall of the bladder (the area from which the original tumor had been removed) which was "suspicious for a primary neoplasm of the bladder or focal cystitis" (primary neoplasm meaning tumor, and focal cystitis meaning bladder irritation or inflammation). The radiologist found "[n]o pathological nodes ... within the pelvis," but "recommended" that the CT scan results be "correlat[ed] with [a] cystoscopy."
Shortly after the CT scan, on April 3, 1997, decedent visited defendant for his regularly scheduled tri-monthly follow-up exam. Defendant reviewed a copy of the radiologist's report on the date of the appointment, but could not recall whether he did so before or after he saw decedent. Defendant also could not recall whether he looked at the CT scan films in addition to the written report. However, it was his practice to review the films of all his patients.
During the April 3, 1997 appointment, defendant performed a physical examination, a urinalysis, a cystoscopy, and an IVP. An "IVP" is an intravenous pyelogram, a diagnostic test that images the body after the injection of a dye. IVPs are used to detect, among other things, the functioning of the urinary tract, from the kidneys to the bladder. They can also be used to detect cancer in the urinary tract. The examination and testing of April 3, 1997, revealed no evidence of cancer.
Based upon the combination of negative test results, defendant determined, and wrote to Dr. Leibowitz on April 7, 1997, that the CT scan had "likely" revealed "scar [tissue] from the resection site" of the 1996 surgical procedure.
Defendant testified that CT scans are not as useful at detecting bladder cancer as a cystoscopy. CT scans often reveal thickening of the bladder wall which is a nonspecific finding that does not necessarily indicate the recurrence of cancer. If, during the cystoscopy, defendant had seen any suspicious areas in decedent's bladder, he would have immediately scheduled a resection or a biopsy.
Defendant did not recall telling decedent that there was a suspicious finding on his CT scan. However, defendant admitted he did not discuss with decedent the possibility of additional diagnostic testing to rule out the recurrence of cancer, because he did not believe any further tests were necessary at that time. Rather, defendant scheduled decedent for another follow-up visit in July 1997.
Decedent returned to defendant's office on June 16, 1997, complaining of blood in his urine, pain in the lower right portion of his abdomen, and sensitivity in his right testicle. Defendant performed a cystoscopy and discovered a tumor in the bladder. Approximately one week later defendant removed the tumor at the Hackensack Medical Center. Subsequent pathology testing revealed that the tumor was cancerous and that the cancer had spread to the surrounding muscle tissue and lymphatic system.
Thereafter, defendant performed additional tests, including a CT scan and a *542 bone scan, to determine the "stage" of decedent's cancer. The July 1997 CT scan did not indicate the presence of pathological lymph nodes. Defendant also discussed treatment options with decedent, recommending removal of the bladder and prostate followed by chemotherapy.
Decedent obtained a second opinion and pursued treatment with Dr. Carl Olsson, a urologist in New York City. Decedent thereafter pursued an aggressive course of treatment, including surgery to remove his bladder by Olsson at the Columbia Presbyterian Medical Center, followed by chemotherapy. However, by the time the bladder was removed, the cancer had already spread extensively to his lymph nodes. Accordingly, decedent had very little chance of survival. The cancer recurred, and a second surgery was performed. Decedent ultimately died in May 1998.

A.
The medical experts disagreed on two main points. First, they disagreed as to whether defendant deviated from the appropriate standard of care when he failed to diagnose decedent with recurrent cancer in April 1997. Second, the experts disagreed as to whether decedent's life expectancy was altered by the failure to diagnose the recurrent cancer at that time.
As to the negligence issue, plaintiff's expert urologist, Dr. Aaron Katz, opined that defendant deviated from the standard of care by not diagnosing recurrent cancer from the CT scan alone. Katz further opined that, given the results of the CT scan, in addition to the tests defendant performed in April 1997 (urinalysis, cystoscopy and IVP), defendant also should have performed a cytology, or taken a tissue sample for a biopsy. Katz admitted, however, that if the CT scan had not been ordered by decedent's primary care physician, defendant would not have been obligated to order one in order to meet the standard of care of a urologist.
Defendant's expert urologist, Dr. Elliot Cohen, disagreed with Katz's analysis. Cohen opined that defendant had not deviated from the standard of care when he diagnosed the March 1997 bladder wall thickening as scar tissue or inflammation, as opposed to recurrent cancer. Cohen opined that bladder wall thickening was not "an unexpected finding" given the surgical procedures and treatments decedent had endured in the previous year. According to Cohen, the thickening alone, combined with negative cystoscopy, IVP, and urinalysis test results, did not warrant a diagnosis of recurrent cancer or any additional treatment or testing at the time. He concluded there was "absolutely no deviation from the standard of care" provided from a urological point of view.
Similarly, defendant's expert radiologist, Dr. Glenn Krinsky, opined that CT scans are not typically used to diagnose bladder cancer. He testified that physicians generally refer their patients to radiologists only after bladder cancer has been diagnosed and "is already known." The CT scan is then used only to "stage" the cancerto determine the extent to which the cancer has metastasized or "spread outside the bladder."
Dr. Krinsky further opined that the bladder wall thickening shown in the March 1997 CT scan films was a "nonspecific finding." It could have been caused by the previous resections and biopsies, the previous BCG treatments, or by an inflammatory condition known as cystitis. Therefore, it was not proof of recurrent cancer.
As to the life expectancy issue, both of plaintiff's expertsKatz, the urologist, and Dr. Barry Singer, an oncologistopined that, because the diagnosis of recurrent *543 cancer was delayed until June 1997, decedent's chances of survival or prolongation of life were decreased. They reached this conclusion because, between April and June 1997, the tumor significantly increased in size and volume, and the cancer had spread beyond the bladder wall and into the lymph nodes. Singer opined that, had the cancer been diagnosed in April 1997, decedent would have had "a 50 percent probability of cure." As of June 1997, however, when the diagnosis was made, "he had a zero prognosis" or chance of survival.
Dr. Katz admitted that it was possible the cancer had spread beyond the bladder as of March 1997, even though it did not show up on the March 1997 CT scan. He nevertheless thought there was a "50/50 shot ... it may have been confined to the bladder at that point," and, therefore, treatable.
On the other hand, defendant's expertsCohen, the urologist, and Dr. Charles Farber, an oncologistopined that decedent's life expectancy was not diminished due to the delay in diagnosing recurrent cancer between the April 3, 1997, and June 16, 1997 appointments. Farber opined that, even if the cancer had been detected in April 1997, "there was no significant difference," his chances of survival were "zero percent," or close to zero percent, given the aggressive nature of the cancer from which he suffered, and the extent to which the cancer had spread beyond the bladder. In this regard, both Cohen and Farber opined that, given the lymphatic involvement at the time of the initial diagnosis in 1996, as well as the "massive [lymph node] involvement" in July 1997, it was very likely that as of April 1997 the cancer had already spread to the lymph nodes.

III.
The jury found that defendant "fail[ed] to inform Arthur Linquito of all the information that a reasonable person in the plaintiff's position would expect a doctor to disclose so that Arthur Linquito might make an informed decision about other diagnostic procedures and a course of treatment." Defendant argues that the informed consent theory, on which the jury found for plaintiff, is not applicable under the facts presented because the patient's allegation is essentially that the physician failed to perform adequate diagnostic testing. Defendant further contends that his motion to dismiss the case on that basis should have been granted.
We agree that the doctrine does not apply and is limited to advice which must be given premised on a proper diagnosis. Stated differently, while the issue is close and there is a viable contention that once a patient is diagnosed with cancer, he must be told of all possible diagnostic techniques he may undergo to evaluate subsequent test results, we decline to extend the doctrine to this situation. Cf. Sinclair v. Roth, 356 N.J.Super. 4, 14, 811 A.2d 460 (App.Div.2002), certif. denied, 176 N.J. 72, 819 A.2d 1188 (2003) (role of intermediate appellate court in medical malpractice case). Where a doctor makes an improper diagnosis that there is no cancer or similar health problem, he cannot be expected to give his patient information necessary to determine whether the additional diagnostic testing should be conducted so that the patient can elect to test for a condition he is told does not exist. The misdiagnosis is subject to recovery on the malpractice or negligence claim.
The informed consent theory recognizes that "[c]hoosing among medically reasonable treatment alternatives is a shared responsibility of physicians and patients." Matthies v. Mastromonaco, 160 *544 N.J. 26, 34, 733 A.2d 456 (1999). Accord, Canterbury v. Spence, 464 F.2d 772, 780 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). To meet their obligation of obtaining informed consent from their patients, physicians must "evaluate the relevant information and disclose all courses of treatment that are medically reasonable under the circumstances," so that patients may make informed decisions as to which treatment option, including the option of non-treatment, to choose. Matthies, supra, 160 N.J. at 34, 36-39, 733 A.2d 456. In determining the level of disclosure required, a "reasonable patient" standard is applied. Physicians must disclose that information material to a reasonable patient's informed decision. Id. at 36, 733 A.2d 456 (citing Largey v. Rothman, 110 N.J. 204, 211-12, 540 A.2d 504 (1988)).
Our Supreme Court's informed consent jurisprudence has addressed the question of whether, after the physician diagnosed the patient, the physician presented the patient with all treatment options that were medically reasonable under the circumstances, and the risks associated with them. See, e.g., Howard v. Univ. of Med. and Dentistry of New Jersey, 172 N.J. 537, 554-59, 800 A.2d 73 (2002); Sgro v. Ross, 166 N.J. 338, 339, 765 A.2d 745 (2001); Matthies, supra, 160 N.J. at 29, 733 A.2d 456; Baird, supra, 155 N.J. at 70-71, 713 A.2d 1019; Largey v. Rothman, 110 N.J. 204, 211-15, 540 A.2d 504 (1988); Perna v. Pirozzi, 92 N.J. 446, 459-65, 457 A.2d 431 (1983).
In this case, defendant reported that decedent had no recurrence of his bladder cancer. If that diagnosis was accurate (something plaintiff challenged in the negligent diagnosis/treatment claim), no further testing or treatment would have been necessary, and there would have been no medically reasonable treatment alternatives for defendant to have discussed with his patient. As intermediate appellate judges, we decline to expand the doctrine of informed consent, Sinclair v. Roth, supra, and the medical costs associated with the possibility a patient will decide to undergo further testing, particularly because plaintiff had a viable malpractice claim that defendant deviated from the standard of care by failing to diagnose the recurring bladder cancer, and by failing to order additional diagnostic tests to ascertain the condition.[2]
We have previously held that the informed consent theory of liability does not apply where the patient's claim is that the physician erred in diagnosing the patient's condition, either through an alleged failure to obtain an adequate medical history or through an alleged failure to perform a sufficient number or type of diagnostic tests. Farina v. Kraus, 333 N.J.Super. 165, 178-79, 754 A.2d 1215 (App.Div.1999) (holding that alleged failure to perform sufficient diagnostic testing); Eagel v. Newman, 325 N.J.Super. 467, 474-75, 739 A.2d 986 (App.Div.1999) (alleged failure to take adequate medical history or to attend to the matter, Judge Pressler stating that "the informed-consent basis of malpractice, as opposed to deviation from the applicable standard of care, rests not upon the physician having erred in diagnosis or administration of treatment but rather in the failure to have provided the patient with adequate information *545 regarding the risks of a given treatment or with adequate information regarding the availability of alternative treatments and the comparative risks of each"). We adhere to those cases. Compare Gilmartin v. Weinreb, 324 N.J.Super. 367, 390, 735 A.2d 620 (App.Div.1999) (citing out-of-state cases holding that informed consent doctrine does not require doctor to advise of alternative diagnoses, but noting it might apply where a specific diagnosis was considered possible by physician but not pursued).
Farina concerned whether a urologist negligently diagnosed and treated bladder cancer. In holding that the doctrine of "informed consent" was not applicable, Judge King wrote:
This case before us is not about options for a course of treatment or for surgery but about suitable diagnostic testing. If the doctor wrongly failed to use the cytology test and this led to a diagnostic mistake which adversely affected the outcome, the doctor can be liable. If the standard of reasonable care did not require using the cytology test to aid a diagnosis, then there is no liability here. There is either a deviation, or there is not. A malpractice defendant does not have a duty to discuss every possible non-invasive risk-free diagnostic or laboratory test with a patient and secure a consent to or waiver thereof. The doctor must, of course, use reasonable care and skill in choosing the diagnostic tests and interpreting the results. If he does not, he is vulnerable.
[Farina, supra, 333 N.J.Super. at 179-80, 754 A.2d 1215.]
In Farina we also concluded that the trial court's submission of the case on a proper theory of liability (negligent diagnosis/treatment), and an improper theory of liability (informed consent), had "irremediably tainted the jury's special verdicts" for plaintiff on the informed consent theory only. Id. at 177-78, 180, 754 A.2d 1215 (quoting Ahn v. Kim, 281 N.J.Super. 511, 534, 658 A.2d 1286 (App. Div.1995), aff'd, 145 N.J. 423, 678 A.2d 1073 (1996)). We found the verdict rejecting the negligent diagnosis/treatment theory "was not trustworthy where the balance of the verdict, on the `informed consent' theory, [suggested that the jury determined] the defendant somehow failed his patient." Id. at 180, 754 A.2d 1215. We expressed concern that the jury's answers to the questions on the verdict sheet, including the percentage apportionment of damages answers, "smack[ed] of a possible compromise verdict." Ibid.
As in Farina, defendant in the present case seeks reversal of the judgment and entry of judgment in his favor, notwithstanding the verdict, based on his unsuccessful motion to dismiss the informed consent theory in the trial court. He asserts the jury properly found for him on the negligence claim and the other theory should not have been presented. In Farina, however, we held that the appropriate result was a reversal of the judgment and remand for a new trial on all issues regarding the negligent diagnosis/treatment claim only. 333 N.J.Super. at 180, 754 A.2d 1215.
Here, plaintiff who was successful on the informed consent, but not the negligence, theory wants a retrial on damages and apportionment only, because her recovery was too low, evidencing a "manifest injustice." As she was unsuccessful on the negligence theory, and the "informed consent" should not have been presented, we believe the Farina approach is the appropriate one to follow, irrespective of whether we deal with a "compromise verdict." In any event, the verdict reveals that the jury believed decedent was wronged and entitled to recovery, and may have considered the interrogatories differently had the case been properly presented only on *546 the negligence-malpractice claim. In these circumstances, we should not speculate on how the jury would have viewed the case if properly presented. Accordingly, we reverse the judgment in favor of plaintiff on the informed consent theory of liability and remand the case for retrial on all issues relating to the negligent diagnosis/treatment theory.

IV.
Plaintiff attacks evidentiary rulings[3] which she asserts resulted in an inadequate monetary award. The need for a new trial, for the reasons already stated, renders these contentions moot, with one exception. We address the exception because it may arise during the new trial on negligence.
Plaintiff contends that the trial court erred in not submitting a separate question to the jury regarding one aspect of decedent's emotional distress damagesthe emotional distress he allegedly suffered when he learned that defendant had not informed him of the March 1997 CT scan report or its result. Plaintiff contends that a separate question was necessary because this discrete aspect of decedent's emotional distress damages should not have been subject to the Scafidi /"lost chance" reduction, as the other aspect of his damages were. We reject the contention.
The emotional distress decedent suffered upon learning that defendant had been negligent cannot logically be separated from the emotional distress he suffered as a result of his "lost chance for recovery," which was subject to reduction by the Scafidi allocation. Therefore, the trial court did not err in refusing to submit a separate interrogatory to the jury.
Over plaintiff's objections, the trial court submitted only one subdivided interrogatory to the jury regarding damages. In relevant part, it asked:
7. What amount of money would fairly and reasonably compensate the estate of Arthur Linquito for the losses sustained by the defendant in damages, as a result of the negligence of Dr. Siegel and/or failure to obtain informed consent by Dr. Siegel:
A. Pain, suffering disability, impairment and loss of enjoyment of life during his lifetime....
Thereafter, as previously noted, in the final judgment, the entire damages award was reduced by the jury's Scafidi allocation, with no exception for the emotional distress aspect of decedent's damages.
In Scafidi, the Supreme Court reduced the burden of proving proximate cause in certain medical malpractice cases. The Court held that, in medical malpractice cases where the physician's negligence combined with the patient's preexisting condition to cause the patient harm, the patient is required to show only that the physician's negligence increased the risk of *547 harm from the preexisting condition, and that the physician's negligence was a "substantial factor" in causing the patient's injuries. Scafidi, supra, 119 N.J. at 101-09, 574 A.2d 398. The Court also held, however, that the plaintiff's damages in such cases must be apportioned between the preexisting condition and physician's negligence, and reduced by the percentage the jury allocates to the plaintiff's preexisting condition. Scafidi, supra, 119 N.J. at 109-14, 574 A.2d 398. See also Verdicchio v. Ricca, 179 N.J. 1, 37-38, 843 A.2d 1042 (2004) (defendant doctor did not satisfy apportionment burden when he failed to diagnose cancer; allocation between negligence and preexisting condition upheld).[4] Thus, the plaintiff may recover damages only for the "lost chance for recovery" caused by the physician's negligence, id. at 112-13, 843 A.2d 1042, and defendant bears the burden of proving that portion of a plaintiff's damages which was the result of the plaintiff's preexisting condition. Id. at 110-13, 843 A.2d 1042. See also Verdicchio, supra, 179 N.J. at 37, 843 A.2d 1042 (burden on doctor "to establish that the damages could be reasonably apportioned and what those apportioned damages were").
Here, plaintiff attempts to limit the Supreme Court's holding in Scafidi. Plaintiff wishes to carve out one aspect of a medical malpractice plaintiff's emotional distress damage awardthe emotional distress the plaintiff suffered as a result of learning that the physician was negligentand remove it from reduction by virtue of the Scafidi allocation. The argument has some appeal given the concept that apportionment is premised on the increased physical risk which is a concept separate from the emotional reaction. See Scafidi, supra, 119 N.J. at 110-13, 574 A.2d 398. Moreover, but for the physician's negligence, a medical malpractice plaintiff would not have suffered emotional distress attributable only to the consequences of the physician's negligence. Nonetheless, there was no expert testimony, if there can be any, that emotional distress can be so isolated and was attributable in this case exclusively to the negligence and lost opportunity for recovery, as opposed to learning of the cancer itself.
The record presents no practical or logical way of separating this aspect of a plaintiff's emotional distress damages from the other aspects of a plaintiff's emotional distress damages stemming from the misdiagnosis and "lost chance for recovery." As the trial judge concluded, the emotional distress the patient suffered from learning of the physician's negligence is "inextricably bound" with the emotional distress the patient suffered from his diagnosis, illness, treatment, and lost chance of recovery, which are subject to apportionment under Scafidi because of his preexisting cancer. Accordingly, any recovery of emotional distress damages will be subject to apportionment.

V.
We remand for a new trial on the negligence-malpractice claim only.
NOTES
[1] In Baird v. American Medical Optics, 155 N.J. 54, 70, 713 A.2d 1019 (1998), the Supreme Court distinguished between a "malpractice claim" and an "informed consent" claim. The Court noted that both are "based on negligence." Id. See also Matthies v. Mastromonaco, 160 N.J. 26, 40-41, 733 A.2d 456 (1999). For present purpose, we treat both theories as part of the malpractice action, and like the parties and court below, distinguish between the traditional "negligence" claim and an "informed consent" claim.
[2] In Matthies, supra, 160 N.J. at 36-37, 733 A.2d 456, the Supreme Court declined to decide whether the informed consent theory of liability applies to alternative diagnoses as well as alternative treatments. Therein, Justice Pollock said "[T]he extent to which the reasonable patient standard obligates physicians to disclose the details of alternative diagnoses, as distinguished from treatment alternatives, is not before us." Ibid.
[3] Plaintiff contends the Law Division committed reversible error when it denied her motion for a mistrial, and her motion for a new trial, based upon the erroneous admission of unexpected testimony from defendant's expert radiologist, Krinsky, inconsistent with the other witnesses, to the effect that the March 1997 CAT scan showed a cancerous lymph node. The trial judge sustained her objection to Krinsky's testimony, struck the offensive testimony, immediately issued a curative instruction regarding the testimony, and offered to issue a second curative instruction during its jury charge (an option plaintiff rejected). Plaintiff contends these remedies were insufficient to overcome the prejudice caused. Plaintiff requests a new trial on damages and on the Scafidi allocation based on these errors. Given our order granting a new trial for the reasons stated, we need not address whether the alleged errors addressed to the negligence claims, either alone or in the aggregate, warrant a new trial.
[4] The claim of negligence in this case was premised on the theory that defendant's failure to diagnose and properly treat decedent, or to perform tests to obtain the proper diagnosis, "increased the risk" of his death and "was a substantial factor in bringing about the harm that occurred." Verdicchio, supra, 179 N.J. at 24, 843 A.2d 1042. Once plaintiff established "that the increased risk was a substantial factor in bringing about the harm that ultimately ensued," our case law required defendant "to establish that the damages could be reasonably apportioned and what those apportioned damages were." Id. at 37, 843 A.2d 1042.