48 A.3d 401

LAURIE NEWMARK–SHORTINO AND MARC SHORTINO,
PLAINTIFFS–APPELLANTS, v. ANDREI BUNA, M.D.,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 14, 2011—Decided July 27, 2012.

Before Judges AXELRAD, SAPP–PETERSON and OSTRER.

*Bruce H. Nagel* argued the cause for appellants (*Nagel Rice, LLP,* attorneys; *Mr. Nagel,* on the brief).

*Christina M. Scarpa* argued the cause for respondent (*Giblin & Combs, LLC,* attorneys; *Ms. Scarpa,* on the brief).

The opinion of the court was delivered by

SAPP–PETERSON, J.A.D.

Plaintiffs, Laurie Newmark–Shortino ("Laurie") and her husband, Marc Shortino ("Marc"), appeal from the judgment of no cause entered following a jury verdict.[1] The jury found that defendant, Andrei Buna, M.D., an obstetrician, was negligent but that his negligence was not the proximate cause of Laurie's injuries. On appeal, plaintiffs contend:

*POINT I*

THE COURT BELOW ERRED BY FAILING TO SUBMIT THE INFORMED CONSENT CLAIM TO THE JURY.

*POINT II*

THE COURT BELOW ERRED BY SUBMITTING THE PROXIMATE CAUSE QUESTION TO THE JURY.

*POINT III*

THE COURT BELOW ERRED BY FAILING TO SUBMIT SEPARATE JURY QUESTIONS FOR EACH CLAIM OF NEGLIGENCE.

*POINT IV*

THE COURT BELOW ERRED BY FAILING TO CHARGE ALTERATION OF RECORDS.

*POINT V*

THE COURT BELOW ERRED BY NOT GRANTING [THEIR] MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR IN THE ALTERNATIVE A NEW TRIAL.

We reject the arguments raised in Points II through V, but we are satisfied the trial court erred, as a matter of law, in declining

---

[1] Reference to plaintiffs by their first names throughout this opinion is for ease of reference only, and we intend no disrespect in doing so.

to submit plaintiffs' claim of lack of informed consent to the jury. We therefore reverse and remand for a new trial on that claim.

## I.

Laurie testified that on August 28, 2006, she went to her first appointment with Dr. Buna. During the physical examination, Dr. Buna noted she had no pain in her abdomen. After a pelvic exam, Dr. Buna informed her that she was about seven weeks pregnant; however, this did not reconcile with the time period when she believed conception occurred. He then told her to come back the next day at 7:30 p.m. for an ultrasound to determine exactly how far along she was in her pregnancy.

Laurie returned the next evening, as instructed, and brought along Marc, their daughter, and her mother, Ann Newmark, so they could all view the ultrasound together. When they arrived, Dr. Buna's sonographer, Linda Ahlborn, performed a transabdominal ultrasound. Because she was "too early on[,]" there was no reading.

Ahlborn then performed a transvaginal ultrasound, during which Laurie and Marc recalled that Ahlborn's facial expression changed, as if something were wrong, and she asked Ann to leave the room with the couple's daughter. Ahlborn then pressed on Laurie's stomach and asked if she felt pain. Laurie told her that she did not feel any pain but "when [Ahlborn] push[ed] on [her] side [she] fe[lt] a little discomfort."

Ahlborn testified that after she performed the transvaginal ultrasound, she spoke to Dr. Buna on the phone and related to him what she observed on the ultrasound: a cystic mass in the right adnexa, an area which includes the fallopian tubes and ovaries. She also observed a "pseudosac" in Laurie's uterus, which could have either been the beginnings of an early intrauterine pregnancy or could have been associated with an ectopic pregnancy.[2]

---

[2] "The development of an impregnated ovum outside the cavity of the uterus." *Stedman's Medical Dictionary* 1438 (27th ed. 2000).

From these observations, Ahlborn's impression was that Laurie either had an ectopic pregnancy or a normal, early intrauterine pregnancy with a small right corpus luteum cyst, which is a type of ovarian cyst. At that point, she was "[a]bsolutely" unable to make a conclusive determination. Ahlborn's notes from the ultrasound state: "? Right Ectopic—vs—Early IUP [3] [with] Right Corpus Luteum Cyst—[P]seudosac in Uterus–No Viable IUP— Seen—No [F]ree [F]luid—Clinical Correlation Needed[.]" After the phone call, Ahlborn returned to the room and told Laurie that Dr. Buna would like to speak with her on the phone.

Laurie testified Dr. Buna told her she had an ectopic pregnancy and she needed to go to the hospital. She started to cry, dropped the phone, and then ran out the room. Marc testified he picked up the phone and asked Dr. Buna what was going on. Dr. Buna told him Laurie had an ectopic pregnancy and she was in imminent danger of rupturing her fallopian tube. Marc asked if Laurie possibly just had an early pregnancy and Dr. Buna responded, " 'It's not possible. It's ectopic.' " He then instructed Marc to have Laurie report to the fourth floor of Saint Clare's Hospital at 7:30 a.m. the next day " 'to get a methotrexate shot to terminate the pregnancy.' "

Laurie, who is an attorney, had a court appearance the following morning. Because she was not experiencing any discomfort, she decided to first attend court to complete a matrimonial proceeding continuing from the previous day. As a result, she, Marc, and Ann arrived at Saint Clare's three hours after the scheduled appointment with defendant. They also met Laurie's brother, Benjamin, at the hospital. Dr. Buna scolded her for being late and informed her the methotrexate injection was ready. Laurie requested a second ultrasound. She testified she did not want to "rely just on [Dr. Buna's] technician for this diagnosis to terminate this pregnancy." Dr. Buna told her that she did not need another ultrasound, his technician had been performing ultra-

---

3 Intrauterine pregnancy.

sounds for twenty-five years, and he had been practicing for thirty years. He reiterated that she had an ectopic pregnancy which had to be terminated; otherwise, she could experience a rupture, with the worse case scenario resulting in her death.[4]

Laurie, however, insisted upon a second ultrasound. Dr. Buna arranged to have a colleague, Dr. Barbara Girz, a specialist in high-risk pregnancies, perform the ultrasound that afternoon. Dr. Buna was present in the room during the procedure, and Laurie heard Dr. Buna murmur something about a "pseudosac." Dr. Girz, however, was silent.

Dr. Buna and Dr. Girz conferred, after which Dr. Buna reported to Laurie she had an ectopic pregnancy. Upon leaving the ultrasound room, he told Marc that Laurie's ectopic pregnancy had been confirmed. He did not relay to Laurie and Marc that Dr. Girz's report was equivocal as to whether she had an ectopic pregnancy. Nor did he advise them of Dr. Girz's recommendation. In the report prepared by Dr. Girz, however, the doctor wrote there was a "small sac noted in the fundus." Dr. Girz's recommendation stated: "The patient is here with Dr. Buna. He will send her for quantitative beta-HCG [5] and re-evaluation for possible methotrexate treatment."

After completing the ultrasound, Laurie asked Dr. Buna whether she could leave and return to the emergency room if she felt any pain. Dr. Buna responded there would not be enough time to

---

[4] Ann and Benjamin, who also testified, confirmed that Dr. Buna only offered Laurie the option of a methotrexate injection as the treatment for her ectopic pregnancy.

[5] Beta–HCG (human chorionic gonadotropin), the hormone created in the embryo after conception, "tells the body to prepare for pregnancy by stopping the monthly menstrual cycle and lining the uterus. This generally happens around [eight] to [ten] days after conception when the embryo begins to implant itself into the uterine lining.... Generally, the amount of [H]CG in the body should double once every two to three days. If the levels ... stay the same or start to decrease, this could indicate a problem with the pregnancy." Susan Morely, *HCG Levels During Pregnancy*, BetaHCG.net (Aug. 16, 2010), http://betahcg.net/hcg-levels-during-pregnancy.

do so. He explained that if there were a rupture, it would happen very fast, and she could die or not be able to have any more children. He also informed Laurie her blood tests reported her beta-HCG level at 917. Beyond advising she could rupture at that number, Dr. Buna did not otherwise explain the significance of the beta-HCG level.

Because Laurie felt overwhelmed by the events, she went to the chapel, believing she was confronted with two options, leaving and possibly dying from a rupture, or taking the methotrexate injection to terminate the pregnancy. Meanwhile, Marc, who remained with Dr. Buna, testified that Dr. Buna, in response to his question whether he was 100 percent certain Laurie had an ectopic pregnancy, answered: " 'It's ectopic, I am certain of it.' " Marc then joined Laurie in the chapel and conveyed to her Dr. Buna's certainty that she had an ectopic pregnancy and advised her to get the injection in order to avoid the risk of death or becoming infertile.

After the couple discussed the matter for another twenty minutes, Laurie agreed to commence the methotrexate treatment, and signed the consent form. Dr. Buna, however, was no longer at the hospital. He had returned to his office. Laurie received the injection around 3:00 p.m. and was told to report to the hospital on September 5 for additional blood work to confirm that her beta-HCG levels were going down.

Laurie and Marc returned to the hospital on September 5, as instructed, and she underwent the scheduled blood test. Later that day, she and Marc received a telephone call from Dr. Buna. He informed them that her beta-HCG level had risen to 4800, and that "the lab must have made a mistake." He also told the couple the rising number " 'could be an indication that this was a normal pregnancy.' " When they inquired whether something could be done to save the baby, Dr. Buna explained the injection could cause severe physical deformities and the fetus would probably not survive. He directed Laurie to take another blood test and to receive her second methotrexate injection.

The next day, Laurie took a third blood test and signed another consent form to receive her second injection. Within hours, Dr. Buna contacted Laurie and reported that her beta-HCG numbers had risen again. Although Laurie requested a third ultrasound, Dr. Buna responded that there was no point in having another ultrasound. Because she was confused by the rising beta-HCG levels and also because she was very upset, she insisted that another ultrasound be scheduled.

Dr. Buna was present while the third ultrasound was being performed. He left the ultrasound room and told Marc, who was waiting outside the room, that Laurie was going to be " 'very, very upset.' " He did not say anything further to Marc, who then said: "You were wrong." Dr. Buna did not respond. Marc then joined Laurie in the ultrasound room. The ultrasound technician turned the monitor so Laurie and Marc could see the screen. They saw the fetus in Laurie's uterus. The fetus, at that point, was five weeks old with cardiac activity and located in the uterus. Based upon Laurie's beta-HCG numbers and the third ultrasound, there was no dispute Laurie had a viable intrauterine pregnancy, and what Dr. Buna diagnosed as an ectopic pregnancy was actually a right corpus luteum cyst. By the time Laurie underwent the third ultrasound, the cyst had shrunk and partly collapsed.

After leaving the hospital, Laurie and Marc decided they would no longer see Dr. Buna. They consulted with another doctor, who advised that Laurie could either wait for the fetus to die or schedule a dilation and curettage procedure ("D & C"). Laurie elected the latter procedure. She was so upset by the events that she started to see a therapist. She became pregnant a few months later and gave birth to a baby boy in June 2007.

Plaintiffs presented Dr. Richard Luciani, board certified in obstetrics and gynecology, as their expert. He testified that neither the first nor second ultrasound could confirm whether Laurie had an ectopic or early intrauterine pregnancy, and therefore, the appropriate standard of care called for a conservative approach consisting of observation and repeated blood tests. He

expressed the opinion that Dr. Buna "absolutely deviated from the accepted standard of care" in four respects: (1) he failed to have Laurie's first ultrasound reviewed and interpreted by a licensed physician on August 29; (2) he ordered methotrexate for Laurie on August 29 based entirely on the ultrasound technician's impression of the first ultrasound, without first having the scan reviewed and interpreted by a licensed physician and without clinical correlation through beta-HCG testing; (3) he moved forward with methotrexate treatment after the second ultrasound on August 30, notwithstanding that Dr. Girz's scan was also inconclusive and Laurie did not exhibit any risk factors for, nor symptoms of, an ectopic pregnancy (e.g., pain or bleeding); and (4) he failed to inform Laurie on August 30 that the first and second ultrasounds were equivocal and that there was a possibility of a normal pregnancy.

In addition, Dr. Luciani expressed the opinion that the right abdominal discomfort Laurie experienced in late August 2006, when the area was pressed, was likely due to the right corpus luteum cyst. Moreover, he did not believe this discomfort presented any urgent need for Dr. Buna to rush to treat Laurie for an ectopic pregnancy before that diagnosis could be confirmed.

Dr. Buna's version of the events was decidedly different. He testified Ahlborn contacted him on August 29 with the results, while plaintiffs were still at his office. She reported the test disclosed Laurie had either an ectopic pregnancy in her right fallopian tube or an early normal pregnancy with a cyst on the right ovary. He considered her reported findings reliable because she was a very experienced sonographer. He testified Ahlborn had been with his practice for more than twelve years, had trained at Yale, and had taken multiple postgraduate and special courses. Prior to joining his practice, she had worked in a high-risk perinatal unit.

When questioned about Ahlborn's entries in the comment section of her August 29 report, Dr. Buna testified that he thought Ahlborn was "questioning the possibility of an ectopic pregnancy.

And she obviously put both options. But the first thing that she was concerned [about] was the right ectopic." He explained that Ahlborn told him she saw a little sac in the uterus, which she described as a pseudosac, but that she did not identify an embryo, a yolk sac, a fetal heart, or something indicative of an early pregnancy, which is what he would have expected if conception occurred during the first half of July.

Based upon the ultrasound results, Dr. Buna spoke with Marc because Laurie, at that point, was upset. He told Marc Laurie "could have an ectopic and we don't know for sure, but, you know, the diagnosis is not definite, but there's a possible ectopic. If it is an ectopic, there are some consequences[.]" He explained he wanted Marc to know the serious consequences that could result if Laurie did have an ectopic pregnancy. He asked to meet with Laurie and Marc the next day at 7:30 a.m. for additional testing in order to

> try to find out what's going on.... [T]he ultrasound, it's not definite either way. It's a suspicion of an ectopic, but it could be another pregnancy. We need to do some additional blood work and if there's an ectopic, then you might have to—we might have do something else, other therapies.

Dr. Buna told the couple he wanted Laurie, when she reported to the hospital the following morning, to complete paperwork to determine whether she qualified for medical therapy, "[a]nd then, once we have the results back, we can sit down and talk and see what was going on."

When Laurie and Marc arrived at Saint Clare's the next morning around 10:45 a.m., Laurie relayed her concerns with Ahlborn's findings and her belief that she did not have an ectopic pregnancy. Dr. Buna expressed his confidence in Ahlborn but invited Laurie to have another ultrasound if a second test would "add something and free [her] mind." He asked Dr. Girz, who, in addition to specializing in high-risk obstetrics, is also an experienced sonographer, to perform the ultrasound. She was available and performed the procedure. He reported that Dr. Girz's impression, from her review of the ultrasound images, was that Laurie had a "[r]ight adnexal complex ... with a lucent area." Dr. Girz

discussed her findings with Dr. Buna and recommended "beta-HCG [testing] and re-evaluation for possible methotrexate treatment."

Dr. Buna testified that after reviewing the ultrasound results with Dr. Girz, he met with Laurie and Marc and discussed options with them. He informed them that his impression was still an ectopic pregnancy but he could not rule out an early pregnancy. He then discussed the therapeutic options, "[o]ne, observation; two, methotrexate therapy." He explained that if Laurie opted for observation, that would involve "repeating the quantitative within the next 12, 24, 48 hours and see[ing] if this quantity is developing or is growing appropriately or consistently with a pregnancy inside the uterus. Or, growing in abnormal fashion and, you know, then it will give us more clues."

With regard to the second option, he told Laurie methotrexate therapy would "spare her fallopian tube. [It w]ould be able to hopefully not get to the point where she would need surgery, and she would have less complications ... if it is successful." He testified that he discussed both options with Laurie

[b]ecause it's part of the counseling. Any physician sits down with a patient and tells him what—these are the options. We are in discovery period. We're working up a diagnosis. We say, listen, this is what's going on. This is what I got right now, that we got a quan [sic] that's—could go either way. We got a[n] empty uterus. We got an adnexal mass. We got some pain that you developed into some progression in the symptoms.

So, yes, I said I favor the ectopic, but I said I can't rule out an early gestation.

Dr. Buna testified that he thought Laurie, at this point, "was happy with the second option, with the observation and she was happy—she came to me and said ... yeah, that's a good idea, let's go ahead and let's do that; and, you know, I'll come in in the morning and do the quantitative HCG, repeat the blood work." He left the hospital, believing Laurie had elected the second option. He returned to his office, where he reviewed the ultrasound films taken by Ahlborn the previous evening and wrote the following progress note in Laurie's file:

8/30/06 Patient had an ultrasound last night; in view of her last menstrual period (6/7/06) a [Right] complex adnexal mass (tender on exam) an enlarged uterus [with] a small sac (pseudosac ?) was noted.

Situation discussed [with] patient and family, patient requested a 2nd ultrasound which was performed by Dr. Girz with similar findings. A quant[itative] BHCG was done stat and was 917 U/L. Situation discussed [with] patient and husband[,] offered methotrexate therapy or observation for 24–48 hours and repeat BHCG if going up/continued observation.

Patient agreed to repeat the blood work in AM.

Dr. Buna testified he did not learn until the next day that Laurie had decided to pursue the methotrexate treatment. An 11:30 a.m. progress note in Laurie's record stated: "Called by the patient who decided last night to have her chemotherapy injection with Methotrexate after I left. Ectopic precautions given for the weekend." He contacted Laurie and told her that although she received the injection, there was still a possibility she could rupture or she might experience some transient discomfort or pain and that if it was persistent or sudden, she should immediately contact him.

His next contact with Laurie occurred on September 5, at which time she underwent further blood testing. The results revealed a beta-HCG level of 4757. Because of this increase, he told Marc there was possibly an early intrauterine gestation. Since Laurie had already received one methotrexate injection, he recommended the second injection. On September 6, Laurie requested another ultrasound, to which he agreed. The ultrasound occurred the next day, and he was present when the test commenced. The technician expressed the need for assistance from another technician and temporarily stopped the procedure.

At this point, it was not very clear to Dr. Buna what was going on, and he had to leave to return to his office. He testified that "during the very end of that exam" he thought "the[re] might have been something in the uterus that could have had a heartbeat or something, a little flickering, but, you know, the technician said, let me get another tech; let me call somebody else to do this exam. So I said, fine." He knew that Laurie "was upset and obviously it was very unfortunate if it was an intrauterine preg-

nancy, so I said we need to come and follow[ ]up and we need to talk and see what's going on and see if [there is] any way I can help them[.]" He planned to sit down with Laurie and Marc to talk with them, but they never returned any of the several calls he placed. Other than submitting a request for her records, he never heard from Laurie or Marc again.

Under cross-examination, Dr. Buna testified he fully informed Laurie and Marc that she could have a normal intrauterine pregnancy and also fully informed them of what their treatment options were before Laurie chose the methotrexate injection option. He also acknowledged that during his deposition, he testified it was Laurie and Marc's decision to terminate the pregnancy, rather than risk an ectopic rupture, notwithstanding their awareness that Laurie's pregnancy could be a normal intrauterine pregnancy. In addition, Dr. Buna agreed that if he had not advised Laurie and Marc there was the possibility of an early intrauterine pregnancy and if he failed to inform them of her treatment options, he would not have obtained her informed consent about her treatment options.

Dr. Buna's expert, Dr. William Ainslie, Jr., board certified in obstetrics and gynecology, testified that based upon his review of a hospital note, it appeared the therapeutic options of observation versus methotrexate injection were discussed with Laurie. He explained that if a suspected ectopic pregnancy is discovered early, then a patient has the option of "observing it or getting treated with methotrexate to basically terminate . . . the abnormal pregnancy without surgery." Under cross-examination, he agreed that the ultrasounds performed by Ahlborn and Dr. Girz were "equivocal, they didn't prove one way or the other[,]" and the proper interpretation of the findings was that there was either a right corpus luteum cyst consistent with an intrauterine pregnancy or a possible ectopic finding. He also agreed if Dr. Buna did not tell Laurie or Marc the pregnancy could potentially be a normal intrauterine pregnancy, that would be a deviation from the

accepted standards of care because he would not have given her information to which she was entitled about her pregnancy.

Further, Dr. Ainslie agreed if Dr. Buna did not tell Laurie she had the option of monitoring her pregnancy through a series of beta-HCGs and repeat ultrasounds, that would also be a deviation from accepted standards of care because Dr. Buna would not have provided Laurie with information to which she was entitled regarding her treatment options, and such omissions would violate Dr. Buna's obligation to obtain Laurie's informed consent to medical treatment. On redirect, however, Dr. Ainslie testified Laurie was given options, as evidenced by the fact that she was given a quantitative beta-HCG before she was administered methotrexate therapy.

## II.

With this disputed evidence before the jury, we turn to the trial court's ruling precluding plaintiffs from submitting the lack of informed consent claim as an additional theory of liability to the jury. Prior to opening statements and the testimonial stage of the trial, the following exchange took place between counsel and the court:

> [PLAINTIFFS' COUNSEL]: I believe, and [defense counsel] will confirm or not what I'm about to say. I believe we've moved a little bit farther forward on the informed consent issue, and it's been agreed that I can discuss in a little more specificity as long as I, you know, don't get too detailed on the legal requirements, but can discuss that she had the right to be given options, know what her options were, etcetera, etcetera.

> I had given Your Honor the little letter brief indicating the case law as to how it's pled and .... that informed consent was expressly discussed by the defense expert, Dr. Ai[n]slie[,] in his report.

> So, really the question becomes, is probably how the court charges the jury is one that can be reserved for later, but for now [defense counsel] and I have agreed that I can say that she had the right to be told on that day of the first shot that there [was] more than one possible diagnosis here, and there was more than one treatment option, and make the decision herself as to which way she could go.

> [DEFENSE COUNSEL]: Judge, I agree in part and disagree in part, but for purposes of the opening that part I agree with.

I think we're going to have to look at the law as to whether this is a case that's ultimately going to be charged as deviation or as informed consent.

But I don't think it matters in terms of opening statements or the testimony. I think Your Honor is probably going to need to hear the testimony in order to make an informed decision on whether it's informed consent or deviation.

I don't think it should be both, but I mean, all of that can be dealt with at a later point in time. We don't have to deal with it now.

Whether the jury would consider plaintiffs' claim of lack of informed consent was next raised when the court conducted its first charge conference just before defendant presented Dr. Ainslie's testimony. The court noted it initially made the point that whether informed consent was in the case should have been a matter of pleading but that it no longer held that view. Citing *Teilhaber v. Greene,* 320 *N.J.Super.* 453, 463–64, 727 *A.2d* 518 (App.Div.1999), the court concluded that a plaintiff is not required to set forth separate legal theories in a pleading, since informed consent is a subgroup of negligence. Nonetheless, the court determined that informed consent should not be submitted to the jury.

The court reasoned that like the plaintiff in *Eagel v. Newman,* 325 *N.J.Super.* 467, 474–75, 739 *A.2d* 986 (App.Div.1999), Laurie confused the course of her condition with the course of treatment:

The plaintiff's informed consent here confuses the course of her condition with the course of treatment.

If the defendant did not advise the plaintiff of the equivocal nature of the ultrasounds[,] that would be a deviation from [the] standard of care. As a result[,] terminating an otherwise viable pregnancy would be negligent treatment.

The defendant's alleged failure to advise the plaintiff respecting the status of her pregnancy is the deviation claim, which led to the wrongful termination of the pregnancy.

Next, citing *Farina v. Kraus,* 333 *N.J.Super.* 165, 178–79, 754 *A.2d* 1215 (App.Div.1999), *certif. denied,* 164 *N.J.* 560, 753 *A.2d* 1153 (2000), the court stated that if Dr. Buna failed to "use reasonable care[ ] and skill in choosing the diagnostic tests[ ] and interpreting the results[,]" this was a deviation from the standard of care, not a lack of informed consent. Finally, relying upon *Linquito v. Siegel,* 370 *N.J.Super.* 21, 33, 850 *A.2d* 537 (App.Div.), *certif. denied,* 182 *N.J.* 143, 861 *A.2d* 847 (2004), the court ruled

that the doctrine of informed consent applies only to the advice given based upon a proper diagnosis. Moreover, because plaintiffs alleged Laurie was given an improper diagnosis of ectopic pregnancy, the court found that the doctrine "should not be extended here[,]" just as it had not been extended in *Linquito* where the plaintiff had been improperly diagnosed as cancer-free.

The court rejected plaintiffs' contention that Dr. Buna placed informed consent in the case with evidence of the options he offered to plaintiffs. The defense argued, and the court agreed, that the options evidence was offered to show that Dr. Buna did not misdiagnose Laurie, rather than as a defense to the lack-of-informed-consent claim:

> So, I do think that to the extent that we heard defense evidence from Dr. Bun[a], as well as from Dr. Ainslie concerning the fact that options were offered, and the pros[ ] and cons of each were discussed[,] that this really goes to the defense of the deviation case, and it did not bring informed consent into the case.

## A.

As the Court has held, a patient in a medical negligence action has three avenues of relief against a physician: "(1) deviation from the standard of care (medical malpractice); (2) lack of informed consent; and (3) battery." *Howard v. Univ. of Med. & Dentistry of N.J.*, 172 *N.J.* 537, 545, 800 *A.*2d 73 (2002). "Although each cause of action is based on different theoretical underpinnings, 'it is now clear that deviation from the standard of care and failure to obtain informed consent are simply sub-groups of a broad claim of medical negligence.'" *Ibid.* (quoting *Teilhaber, supra,* 320 *N.J.Super.* at 463, 727 *A.*2d 518). While deviation from the standard of care and informed consent are "often inter-twine[d]," these two theories of liability are distinct in that they reflect two separate duties of a physician: (1) the duty to diagnose and treat a patient in accordance with the standard of care; and (2) the duty to disclose all medically reasonable treatment alternatives (including the option of non-treatment with observation, as is alleged here) so that a patient may make an informed decision.

*Matthies v. Mastromonaco,* 160 *N.J.* 26, 39–40, 733 *A.*2d 456 (1999).

■ In order to establish a prima facie case for medical negligence premised on a theory of deviation from the standard of care, a plaintiff must generally present expert testimony establishing " '(1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury.' " *Teilhaber, supra,* 320 *N.J.Super.* at 465, 727 *A.*2d 518 (quoting *Gardner v. Pawliw,* 150 *N.J.* 359, 375, 696 *A.*2d 599 (1997)). To establish a prima facie case of medical negligence premised upon a theory of lack of informed consent, a plaintiff must show:

(1) the physician failed to comply with the applicable standard for disclosure; (2) the undisclosed risk occurred and harmed the plaintiff; (3) a reasonable person under the circumstances would not have consented and submitted to the operation or surgical procedure had he or she been so informed; and (4) the operation or surgical procedure was a proximate cause of plaintiff's injuries.

[*Ibid.* (quoting *Bennett v. Surgidev Corp.,* 311 *N.J.Super.* 567, 572–73, 710 *A.*2d 1023 (App.Div.1998)).]

Thus, an informed consent claim "rests not upon the physician having erred in diagnosis or administration of treatment but rather in the failure to have provided the patient with adequate information regarding the risks of a given treatment or ... regarding the availability of alternative treatments and the comparative risks of each." *Linquito, supra,* 370 *N.J.Super.* at 35, 850 *A.*2d 537 (internal citation omitted).

■ We have previously held that "the informed consent theory of liability does not apply where the patient's claim is that the physician erred in diagnosing the patient's condition, either through an alleged failure to obtain an adequate medical history or through an alleged failure to perform a sufficient number or type of diagnostic tests." *Id.* at 34–35, 850 *A.*2d 537 (citing *Farina, supra,* 333 *N.J.Super.* at 178–79, 754 *A.*2d 1215 (alleged failure to perform sufficient diagnostic testing); *Eagel, supra,* 325 *N.J.Super.* at 474–75, 739 *A.*2d 986 (alleged failure to take adequate medical history or to attend to the matter)). Likewise, the

doctrine does not apply when a physician misdiagnoses a patient as not having a certain health problem. *Id.* at 33, 850 *A.*2d 537.

The doctrine does apply where a patient has been deprived "of the opportunity to reasonably determine for herself whether she wishes to accept the risks of a proposed or alternate treatment[.]" *Eagel, supra,* 325 *N.J.Super.* at 476, 739 *A.*2d 986. Further, under such circumstances, the doctrine applies "irrespective of whether the treatment itself is performed in accordance with prevailing medical standards." *Ibid.*

### B.

In ruling that the jury would not be charged with informed consent, the trial court expressed the view that

this [case] was set up as a failure to diagnose case involving deviations from a standard of care, and as [a] result of it having been pled, and tried in this fashion, I conclude that it is not an informed consent case.

Why? Well, informed consent usually deals with a proper diagnosis, and then it is a question of treatment, and whether the doctor adequately explained the treatment options, the pros and cons of each of those options to the patient. If there was negligence ... in carrying out one of those options, then you might have both a standard of care case, as well as an informed consent case, but that is not this situation, and as I reviewed the three cases, [*Linquito, Farina* and *Eagel* ], I believe that there is only one decision which can be reached here, and that is that informed consent should not be a charge of the [c]ourt.

We disagree with this analysis and conclude the factual underpinnings that informed our analyses in *Linquito, Farina,* and *Eagel* are not present here. We are convinced this case presents the factual pattern where both theories of liability should have been presented to the jury.

*Linquito* and *Farina* both involved a defendant who failed to conduct certain diagnostic tests to detect cancer in the plaintiffs. *Linquito, supra,* 370 *N.J.Super.* at 25, 850 *A.*2d 537; *Farina, supra,* 333 *N.J.Super.* at 168–74, 754 *A.*2d 1215. In both cases, we held that the issue was one of negligent diagnosis (deviation from the standard of care) and not one of informed consent, since there is no duty to inform a patient of every available diagnostic test.

*See Linquito, supra,* 370 *N.J.Super.* at 34–35, 850 *A.*2d 537; *see also Farina, supra,* 333 *N.J.Super.* at 179–80, 754 *A.*2d 1215.

Informed consent was also not applicable under the facts in *Eagel* because the "crux" of the claim was that the defendant internist "did not appreciate the seriousness of [the plaintiff's mitral valve prolapse], that he did not respond appropriately to it, and that these failures permitted her to regard her condition too cavalierly." *Eagel, supra,* 325 *N.J.Super.* at 474, 739 *A.*2d 986. We found the evidence solely supported a deviation-from-the-standard-of-care theory of liability premised upon the defendant's negligent treatment of the plaintiff in "[n]ot taking the necessary and available steps to protect the patient or to permit the patient to protect [herself] from the potential course of the disease[.]" *Id.* at 475–76, 739 *A.*2d 986.

Additionally, we noted that not giving information regarding the course of a disease is a "very different matter[ ]" from not giving information regarding the course of treatment to be taken. *Ibid.* We found that only the latter invokes the doctrine of informed consent because it "[d]epriv[es] the patient of the opportunity to reasonably determine for herself whether she wishes to accept the risks of a proposed or alternate treatment[.]" *Id.* at 476, 739 *A.*2d 986.

Laurie claims she was neither advised nor offered any option other than methotrexate therapy—treatment intended to terminate the pregnancy. If, however, Laurie had a confirmed ectopic pregnancy as she claimed Dr. Buna advised, then there were no treatment options other than termination of the pregnancy.[6] On the other hand, Dr. Buna testified that he diagnosed an equivocal pregnancy and informed Laurie and Marc of the treatment options for an equivocal pregnancy. Both experts agreed that observation is an appropriate alternative to methotrexate therapy if there is a

---

[6] There were alternative options for terminating the pregnancy, namely, methotrexate therapy versus a D & C, but plaintiff is not raising an issue in this regard.

suspected ectopic pregnancy *and,* if it is in its early stages, as was indisputably the case here. Therefore, Laurie was entitled to have the jury consider both her claim of deviation from the standard of care and lack of informed consent based upon these unique facts.

The jury was only asked to resolve the misdiagnosis and in that regard may have found that Dr. Buna was negligent in ordering the methotrexate therapy before confirming Ahlborn's reported findings, but may have credited Dr. Buna's testimony that he diagnosed an equivocal pregnancy. In finding no causation, the jury may have found that faced with two equivocal pregnancy diagnoses, Laurie and Marc elected the methotrexate therapy rather than risk infertility or further injury. The jury was never asked, however, whether, as Dr. Buna claimed, he advised Laurie of the treatment options associated with an equivocal diagnosis or, for that matter, an early stage suspected ectopic pregnancy.

As such, the jury's verdict that Dr. Buna's negligence was not the proximate cause of Laurie's resulting injury could have been reached without consideration of whether Laurie was properly advised of all reasonably available treatment options. The conflicting versions of the evidence should have been submitted to the jury not only to address the misdiagnosis claim but also to resolve plaintiffs' claim of liability based upon the lack of informed consent, particularly when the issue was before the jury as early as plaintiffs' counsel's opening statement.

The trial court, in declining to submit informed consent to the jury, mistakenly focused upon the language in *Linquito* that the doctrine of informed consent "is limited to advice which must be given premised on a proper diagnosis[,]" without considering our underlying rationale for that statement. *Linquito, supra,* 370 *N.J.Super.* at 33, 850 *A.*2d 537. There, we were confronted with a plaintiff who had been misdiagnosed as cancer-free. *Id.* at 26–30, 850 *A.*2d 537. We reasoned that it would not have made sense to require the doctor to inform the patient of treatment options or further cancer-testing options so that he could "elect to test for a

condition he is told does not exist." *Id.* at 33–34, 850 *A*.2d 537. In that situation, the only logical theory of recovery was liability premised upon the misdiagnosis. *Id.* at 36–37, 850 *A*.2d 537. Such reasoning does not apply here because plaintiffs presented sufficient proof to submit both theories of liability to the jury. *Matthies, supra,* 160 *N.J.* at 39–40, 733 *A*.2d 456.

The trial judge, in analogizing the facts here to those in *Eagel,* overlooked the fact that Laurie raised the issue of an undisclosed treatment option available to her, a factor not present in *Eagel.* Moreover, in *Eagel* we noted that "[d]epriving the patient of the opportunity to reasonably determine for herself whether she wishes to accept the risks of a proposed or alternate treatment is an informed consent failure irrespective of whether the treatment itself is performed in accordance with prevailing medical standards." *Eagel, supra,* 325 *N.J.Super.* at 476, 739 *A*.2d 986.

Finally, given the unique facts of this case, namely, at the very least, a diagnosis of an equivocal pregnancy, or at the very worst, a diagnosis of an ectopic pregnancy, albeit at its early stage, we disagree with the trial court's expressed concern that, if it charged the jury on informed consent in this case, then "every ... misdiagnosis case would automatically give ris[e] to an informed consent claim, because ... patient[s] would, of course, not be advised of their options to treat the condition they didn't know they had." While the facts supporting each theory of liability may be intertwined, the viability of each claim is separate and distinct.

To summarize, we conclude the trial court erred in failing to submit plaintiffs' informed consent claim to the jury. While plaintiffs did not specifically plead a lack of informed consent in their complaint, the underlying facts giving rise to such a claim were sufficiently established at trial to entitle plaintiffs to submit the question of whether Dr. Buna failed to provide Laurie "with adequate information ... regarding the availability of alternative treatments and the comparative risks and benefits of each." *Id.* at 474–75, 739 *A*.2d 986; *see also Farina, supra,* 333 *N.J.Super.* at 178–79, 754 *A*.2d 1215. The error in denying plaintiffs' request to

charge the jury on the lack of informed consent was "clearly capable of producing an unjust result," *R.* 2:10–2, and requires reversal.

## III.

In plaintiffs' Point II, they contend the trial court erred in submitting the question of proximate cause to the jury since, if the jury found that Dr. Buna was negligent in any way, then it would "necessarily result in some injury as a matter of law." We disagree.

Where a plaintiff has objected to the charge of proximate cause, the harmless error standard of review applies, and submission of the question of proximate cause to the jury will withstand attack under appellate review unless the error was "clearly capable of producing an unjust result." *R.* 2:10–2; *State v. Bradshaw,* 195 *N.J.* 493, 509, 950 *A.*2d 889 (2008). We are satisfied that any finding the jury may have made that Dr. Buna was negligent in relying upon the ultrasound results provided by Ahlborn to advise Laurie she had an ectopic pregnancy, and scheduling her for a methotrexate injection, was not dispositive of proximate cause, in light of Dr. Girz's findings the next day and evidence presented by the defense that from the outset, he informed plaintiffs of the equivocal ultrasound results from Ahlborn, as well as from Dr. Girz. Dr. Buna also testified he advised plaintiffs of all reasonably available treatment options. Consequently, the defense was entitled to have the jury consider whether Dr. Buna's conduct was the proximate cause of Laurie's resulting injury.

## IV.

In Point III, plaintiffs contend the trial court erred in failing to submit their proposed separate jury questions for each claim of negligence:

(1) Did Dr. Buna deviate from accepted standards of medical practice in the care and treatment he provided to Laurie Newmark–Shortino on August 29, 2006?

(2) Did Dr. Buna deviate from accepted standards of medical practice in the care and treatment he provided to Laurie Newmark–Shortino on August 30, 2006?

(3) Dr. Buna deviate from accepted standards of medical practice due to a failure to give appropriate information to Laurie Newmark–Shortino regarding her pregnancy and her treatment options?

The court submitted only the following negligence question to the jury: "Did the defendant Dr. Andrei Buna deviate from the accepted standards of medical practice in the diagnosis and/or treatment of the plaintiff Laurie Newmark–Shortino?" Plaintiffs contend that combining the negligence claims into one single interrogatory was confusing. Setting aside the court's refusal to submit informed consent to the jury, we find no error in submitting one negligence claim for the jury's consideration.

"Ordinarily, 'a trial court's interrogatories to a jury are not grounds for reversal unless they were misleading, confusing, or ambiguous.'" *Ponzo v. Pelle*, 166 *N.J.* 481, 490, 766 *A.*2d 1103 (2001) (quoting *Sons of Thunder v. Borden, Inc.*, 148 *N.J.* 396, 418, 690 *A.*2d 575 (1997)). "Interrogatories are meant to serve particular purposes: 'to require the jury to specifically consider the essential issues of the case, to clarify the court's charge to the jury, and to clarify the meaning of the verdict and permit error to be localized.'" *Id.* at 490–91, 766 *A.*2d 1103 (quoting *Wenner v. McEldowney & Co.*, 102 *N.J.Super.* 13, 19, 245 *A.*2d 208 (App. Div.), *certif. denied*, 52 *N.J.* 493, 246 *A.*2d 452 (1968)). Furthermore, when a case involves multiple claims, "multiple interrogatories are not only the best way to focus the jury's attention on the details of the case but also to ascertain, with some degree of specificity, what the jury has actually determined." *Id.* at 492, 766 *A.*2d 1103 (citations omitted). Nonetheless, not every case "requires finely diced interrogatories." *Ibid.*

Here, apart from the error in not submitting informed consent to the jury, which would have necessitated a separate interrogatory, Dr. Luciani's expert opinion regarding Dr. Buna's negligence implicates a deviation from the standard of care theory of liability: (1) diagnosing Laurie with an ectopic pregnancy before reviewing her first ultrasound on August 29; (2) ordering a methotrexate

injection for Laurie based upon that incorrect diagnosis; and (3) holding to the diagnosis of an ectopic pregnancy and moving forward with methotrexate treatment on August 30 even though the second ultrasound was also inconclusive. We find no basis to conclude submission of a single interrogatory was "confusing" for the jury and that there was a need to separate plaintiffs' allegations of deviation into "finely diced interrogatories." *See id.* at 490–92, 766 *A.*2d 1103.

## V.

In Point IV, plaintiffs contend the trial court erred in failing to instruct the jury on alteration of records. They maintain they presented sufficient evidence to prove Dr. Buna fabricated and later inserted the August 30, 2006 notes in Laurie's Saint Clare's Hospital chart and his office chart for an alteration-of-records charge to have been required.

The basis of plaintiffs' claim that Dr. Buna altered medical records is grounded upon three circumstances: (1) the fact that the 2:00 p.m. August 30, 2006 note in Laurie's hospital chart was a "stand[-]alone note on its own piece of paper" so it could have easily been inserted later by Dr. Buna, who had access to these records; (2) the August 30, 2006 note in Laurie's office chart also could have been fabricated because Dr. Buna had access to his own records; and (3) Laurie and her family's testimony disputed that Dr. Buna had ever discussed the option of observation with Laurie.

▇▇▇ Physicians have a "duty to ensure that '[a]ll treatment records ... accurately reflect the treatment or services rendered.'" *Rosenblit v. Zimmerman,* 166 *N.J.* 391, 399 n. 1, 766 *A.*2d 749 (2001) (quoting *N.J.A.C.* 13:35–6.5(b)); *see also In re Jascalevich License Revocation,* 182 *N.J.Super.* 455, 471, 442 *A.*2d 635 (App.Div.1982). In cases where a plaintiff has presented evidence that a defendant physician has intentionally altered medical records, a jury may infer that the records were altered because the physician "believed that the original record would have been

unfavorable in the trial of this matter." *Model Jury Charge (Civil)*, 5.50H "Alteration of Medical Records" (2009). If evidence that a physician has altered medical records has been excluded from a malpractice trial, reversal may be warranted where the exclusion of that evidence was clearly capable of producing an unjust result. *Zimmerman, supra*, 166 *N.J.* at 410, 766 *A.*2d 749 (citing *R.* 2:10–2).

Here, the trial court declined to charge alteration of records primarily because it agreed, as the defense argued, that there was an absence of direct proof. Proof of a fact may be proved by both direct evidence and circumstantial evidence. *State v. Phelps*, 96 *N.J.* 500, 511, 476 *A.*2d 1199 (1984) (independent evidence establishing a conspiracy to commit a crime may be established by a combination of different types of proof, including testimony of witnesses and may be either direct or circumstantial). Both direct and circumstantial evidence are equally acceptable forms of proof. *Ibid.* Indeed, circumstantial evidence may be deemed more certain and satisfying than direct evidence. *N.J. Div. of Youth & Family Servs. v. A.C.*, 389 *N.J.Super.* 97, 111–12, 911 *A.*2d 104 (Ch.Div.2006).

This is not a case where the sole evidence from which plaintiffs seek to have the jury find that Dr. Buna altered records comes from the testimony of plaintiffs. Laurie's mother, Ann, and Laurie's brother, Benjamin, corroborated plaintiffs' testimony that Dr. Buna never discussed treatment options other than methotrexate therapy. Plaintiffs also presented evidence of Dr. Buna's ability to access both Laurie's hospital records and his own office records. Had the court instructed the jury on alteration of medical records, as requested, such evidence would have been relevant on the issue of Dr. Buna's credibility.

The trial court, however, allowed plaintiffs to raise the issue of alteration of records in plaintiffs' counsel's opening and closing statements. In addition, plaintiffs were permitted to put forth their proofs on this issue in their case in chief. The court additionally provided a comprehensive jury instruction on credibil-

ity, noting at the outset that the evidence presented was "diametrically opposed so you've got to make a credibility judgment." Because plaintiffs were permitted to advance their argument that the records in question had been altered, we are not persuaded the court's failure to instruct the jury on alteration of records was clearly capable of producing an unjust result. In view of our reversal and remand for a new trial on the informed consent claim, plaintiffs should not be precluded from revisiting this issue at the time of trial.

## VI.

Finally, plaintiffs argue the trial court erred in denying their motion for a new trial or for judgment notwithstanding the verdict ("j.n.o.v."), *R.* 4:40–2, which was brought on the grounds that the jury's verdict was "a logical impossibility." We disagree.

In our review of a motion for a j.n.o.v., "the inquiry is whether the evidence at trial supported the jury's verdict." *State v. Papasavvas,* 170 *N.J.* 462, 479, 790 *A.*2d 798 (2002). That is, our function "is to determine whether a reasonable jury 'could have' made the findings at issue in light of the evidence presented." *Ibid.* Furthermore, " 'we must accept as true all evidence supporting the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced [from the evidence].' " *Besler v. Bd. of Educ. of W. Windsor–Plainsboro Reg'l Sch. Dist.,* 201 *N.J.* 544, 572, 993 *A.*2d 805 (2010) (quoting *Lewis v. Am. Cyanamid Co.,* 155 *N.J.* 544, 567, 715 *A.*2d 967 (1998)). "A jury's verdict should not be disturbed merely because 'reasonable minds' might have reached different conclusions based on the evidence." *Ibid.* (citations omitted).

In this case, as previously discussed, assuming the jury believed Dr. Buna's testimony that he discussed all reasonable options with plaintiffs, it could have reasonably found that he was negligent in relying solely upon the ultrasound findings of Ahlborn in setting up the methotrexate therapy. However, in light of the options he

discussed with plaintiffs, as well as the second ultrasound performed by Dr. Girz, which Dr. Buna simultaneously reviewed and discussed with Dr. Girz and which result was consistent with Ahlborn's findings, plaintiffs' resulting injury was not proximately caused by Dr. Buna's initial negligence. Accordingly, we find no merit to plaintiffs' claim that the trial court erred in denying their motion for j.n.o.v.

Reversed and remanded for a new trial on plaintiffs' claim of lack of informed consent, but otherwise affirmed. We do not retain jurisdiction.